JOAN O. HOLBROOK *v.* TITUS J. CASAZZA
(12863)

JOAN O. HOLBROOK *v.* GALA H. NORDQUIST
(12864)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and MORAGHAN, Js.

Argued April 8—decision released July 7, 1987

*William F. Gallagher,* with whom were *Evelyn A. Barnum* and, on the brief, *Steven J. Errante* and *David J. Peska,* for the appellants (defendants).

*Roger Sullivan,* for the appellee (plaintiff).

SHEA, J. The principal issue in these appeals is whether the statements of the defendants accusing the plaintiff of numerous improprieties in performing her duties as tax assessor in the town of Westbrook were made with actual malice. The plaintiff brought separate defamation actions against the defendants, mem-

bers of the board of tax assessors for the town, seeking compensatory and exemplary damages for harm to her reputation, mental anguish, pain and suffering, public humiliation, and pecuniary loss alleged to have resulted from defamatory statements of the defendants. Following a trial in which the cases were consolidated, the jury returned verdicts against both defendants for an aggregate amount of $28,000 in general damages, $181,000 in special damages, and $77,477 in exemplary damages. While ordering remittiturs amounting to $3828 with respect to the awards of exemplary damages, the trial court denied the defendants' motions to set aside the verdicts against them, from which denials the defendants have appealed. We find no error.

From the evidence the jury could reasonably have found the following facts. In January, 1982, the defendant, Titus J. Casazza, obtained from an appraisal firm a reduction of $2300 in the appraised value of property belonging to him. Upon learning of this, the plaintiff, Joan O. Holbrook, then chairman of the board of assessors for the town, questioned Casazza about the use of his position as a member of the board of assessors in obtaining the reduction, and mentioned that Casazza's neighbors had not been accorded comparable treatment. Casazza responded angrily to a statement made by the plaintiff during that conversation "that it was quite unethical of him to use his office to further personal gain." Following this incident, Casazza remained away from the assessor's office for approximately one month. After his return on February 23, 1982, he spent "a good part of [the] time" investigating the office records with a view toward discovering any misconduct on the part of the plaintiff in her work as an assessor.

It was also on February 23, 1982, that an abstract compiling the 1981 decennial revaluations of real prop-

erty in Westbrook was completed. The plaintiff, the most experienced member of the board of assessors, had performed most of the revaluation work. Because the board was comprised of three persons, the plaintiff, the defendant Casazza, and the defendant Gala H. Nordquist, the signing of the abstract by the plaintiff and Nordquist, a majority of the board, validated it as the grand list for the town. Casazza, who refused to sign, subsequently persuaded Nordquist that she had endorsed a list that had been wrongfully altered by the plaintiff. Concerned about this criticism, Nordquist "stayed home for a day or two" until asked by the plaintiff to return. Upon returning, an argument occurred during which the plaintiff told Nordquist that she "had no business being an assessor." Nordquist became angry, was "reduced to tears," and immediately went to the office of Donald Morrison, first selectman for the town, and told him of Casazza's criticisms.

During a series of meetings in March, 1982, the defendants complained to Morrison, other selectmen, and the town council of misconduct on the part of the plaintiff. Among the accusations were allegations of improper field card erasures and unauthorized reductions in property values for relatives and friends. Morrison, with the consent of the parties, requested an investigation of the complaint by the Connecticut Association of Assessing Officers, which appointed a committee to conduct the investigation. After examining the records in the assessors' office and inspecting several of the relevant properties, the committee, on April 27, 1982, issued its report finding "no wrongdoing on the part of" the plaintiff.

On the following day the defendants submitted a further complaint to the office of policy and management (OPM), the state agency charged with the supervision of municipal assessors. See General Statutes § 12-1c. In summary, the defendants accused the plaintiff of:

(1) unilaterally changing assessed values in violation of General Statutes § 12-62;[1] (2) making unauthorized substantive changes in the 1981 grand list in violation of General Statutes § 12-60;[2] (3) illegally erasing several hundred property assessments; (4) reducing the assessments upon properties owned by friends and family members; and (5) increasing the assessments upon properties owned by people who were in her disfavor. With respect to several of their accusations, the defendants, before filing their complaint, did not seek an explanation from the plaintiff of the reasons for her actions. Additionally, with respect to their allegations of favoritism, the defendants did not "go back and consult the 1971 book to see what if any reductions were given in 1971." The defendants, furthermore, neither consulted an attorney nor sought the advice of any other assessors.

On June 22, 1982, the OPM released a committee report finding that all of the contested changes made by the plaintiff had been "appropriate," that no evidence existed of "partiality or bias," and therefore that the defendants' accusations were "invalid." At first selectman Morrison's request, however, the report included a comment that erasing, the method used by

---

[1] "General Statutes Sec. 12-62. PERIODIC REVALUATION OF REAL ESTATE. (a) Commencing October 1, 1978, the assessors of all towns, consolidated towns and cities and consolidated towns and boroughs shall, no later than ten years following the last preceding revaluation of all real property and every ten years after each such revaluation, view all of the real estate of their respective municipalities, and shall revalue the same for assessment and, in the performance of these duties, except in any municipality where there is a single assessor, at least two of the assessors shall act together, and all valuations shall be separately approved by a majority of the assessors. . . ."

[2] "General Statutes Sec. 12-260. CORRECTION OF CLERICAL ERROR IN ASSESSMENT. Any clerical omission or mistake in the assessment of taxes may be at any time corrected according to the fact by the assessors or board of tax review, and the tax shall be levied and collected according to such corrected assessment."

the plaintiff to correct field cards, while not illegal, was not the preferred method, which is "to draw a line through the value to be changed and enter the new value."

Casazza nevertheless filed another complaint with the supervisor of the OPM in which he repeated his previous accusations. The OPM declined to reopen its investigation. On September 22, 1982, the plaintiff mailed to the defendants a demand for retraction of their accusations, but the defendants refused to comply.

During the spring and summer of 1982, the news media provided extensive coverage of the controversy between the parties. The media detailed the charges of misconduct underlying the investigations of the plaintiff, and numerous articles featured quotations from Casazza. The impact of the defendants' accusations upon the plaintiff's reputation resulted in the plaintiff being dropped from consideration for the newly created position of single assessor for the town. Additionally, after having applied for assessor positions in fifty-two towns within a one hundred mile radius of Westbrook, at least three of which were actively seeking an assessor, the plaintiff received only one interview, which did not result in a job offer. The plaintiff, furthermore, felt compelled to move from Westbrook to an adjoining community.

The plaintiff brought the present actions in November, 1982. In these appeals from the judgments rendered by the trial court in accordance with verdicts for the plaintiff, the defendants claim: (1) that the evidence was insufficient to support findings of falsity and malice; (2) that the trial court erred in various aspects of its jury charge; (3) that the allusion by the plaintiff's counsel during trial to an indemnification of the defendants by the town warranted a mistrial; (4) that the court

erred in excluding evidence of the sale price of property owned by the plaintiff's husband; and (5) that the damage awards are excessive.

## I

The rule set forth by the United States Supreme Court in *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 279–80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), prohibits a public official from recovering damages for a defamatory falsehood unless he proves that the false "statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." See also *St. Amant* v. *Thompson,* 390 U.S. 727, 730–31, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968). Further, those who "are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with" such actual malice. *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). In this appeal the plaintiff concedes that, as a tax assessor, she "had substantial responsibility for the conduct of her office in establishing property values and therefore was a public official according to standards set by federal law." Cf. *New York Times Co.* v. *Sullivan,* supra (elected commissioner as public official); *Moriarty* v. *Lippe,* 162 Conn. 371, 294 A.2d 326 (1972) (patrolman); *Ryan* v. *Dionne,* 28 Conn. Sup. 35, 248 A.2d 583 (1968) (tax collector).

The jury affirmatively answered special interrogatories submitted by the court, expressly finding that (1) the defendants uttered and published defamatory statements about the plaintiff, and that, by clear and convincing evidence, such statements (2) were false and (3) were made with actual malice. The defendants first claim that the trial court erred in denying their motions

to set aside the verdict and render judgment notwithstanding the verdict because the verdict is not supported by the evidence.

## A

We must preliminarily determine the proper standard of appellate review. Appellate courts ordinarily do not disturb the facts as found by a jury unless it appears that the evidence furnished no reasonable basis for the jury's conclusions. *Moriarty* v. *Lippe,* supra, 374; *Petrizzo* v. *Commercial Contractors Corporation,* 152 Conn. 491, 499, 208 A.2d 748 (1965). The evidence is given the most favorable construction to which it is reasonably entitled in support of the verdict. *Wochek* v. *Foley,* 193 Conn. 582, 587, 477 A.2d 1015 (1984); *Petrillo* v. *Bess,* 149 Conn. 166, 167, 179 A.2d 600 (1961); *Kerrigan* v. *Detroit Steel Corporation,* 146 Conn. 658, 660, 154 A.2d 517 (1959).

Where a defamation action has successfully been brought by a public official, however, the issues involve the demarcation between speech that is unconditionally guaranteed and speech that may legitimately be regulated. Cf. *Speiser* v. *Randall,* 357 U.S. 513, 525, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958). "In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' *Pennekamp* v. *Florida,* 328 U.S. 331, 335 [66 S. Ct. 1029, 90 L. Ed. 1295 (1946)] . . . . We must 'make an independent examination of the whole record,' *Edwards* v. *South Carolina,* 372 U.S. 229, 235 [83 S. Ct. 680, 9 L. Ed. 2d 697 (1963)], so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *New York*

*Times Co.* v. *Sullivan,* supra, 285; cf. *New York* v. *Ferber,* 458 U.S. 747, 774 n.28, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982); *Hess* v. *Indiana,* 414 U.S. 105, 108–109, 94 S. Ct. 326, 38 L. Ed. 2d 303 (1973); *Miller* v. *California,* 413 U.S. 15, 25, 93 S. Ct. 2607, 37 L. Ed. 2d 419, reh. denied, 414 U.S. 881, 94 S. Ct. 26, 38 L. Ed. 2d 128 (1973); *Street* v. *New York,* 394 U.S. 576, 592, 89 S. Ct. 1354, 22 L. Ed. 2d 572 (1969).

In *Bose Corporation* v. *Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S. Ct. 1949, 80 L. Ed. 2d 502, reh. denied, 467 U.S. 1267, 104 S. Ct. 3561, 82 L. Ed. 2d 863 (1984), the United States Supreme Court elaborated upon the "constitutionally based rule" of independent review. The court maintained that the rule preserves the "due regard" that is ordinarily given to the trial judge's opportunity to observe the demeanor of the witnesses. Id., 499–500. In a footnote, the *Bose* court clarified that "[t]he independent review function is not equivalent to a *'de novo'* review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff." Id., 514 n.31. The court noted that, apart from the finding of actual malice, to which the rule of independent review applies, the other findings of fact in a defamation case are properly tested under the clearly erroneous standard of review. Id.; see also *Time, Inc.* v. *Pape,* 401 U.S. 279, 284, 91 S. Ct. 633, 28 L. Ed. 2d 45, reh. denied, 401 U.S. 1015, 91 S. Ct. 1248, 28 L. Ed. 2d 552 (1971); cf. *Tavoulareas* v. *Piro,* 817 F.2d 762 (D.C. Cir. 1987). As we have stated, it is the finding of actual malice by clear and convincing proof that impels a defamatory falsehood uttered against a public official across the constitutional threshold and into the limited category of "unprotected" speech.

B

We initially dispose of the defendants' claim that the evidence was insufficient to support the findings by the jury in their respective cases that the defamatory statements were false. We note that in these appeals the defendants challenge such findings only in respect to their statements that the plaintiff improperly changed assessments in the 1981 grand list in violation of General Statutes §§ 12-62 and 12-60. Moreover, the defendants conceded at oral argument that there had been no evidence underlying their accusations that the plaintiff had increased assessments upon properties owned by persons who were in her disfavor.

The jury returned a general verdict for the plaintiff while answering affirmatively the special interrogatory whether "the plaintiff proved by clear and convincing evidence the falsity of *any* of the defamatory statements." (Emphasis added.) This court has recognized that a general verdict for one party raises a presumption that the jury found every issue in favor of " 'the prevailing party.' " *Alfano* v. *Insurance Center of Torrington,* 203 Conn. 607, 613, 525 A.2d 1338 (1987); *Finley* v. *Aetna Life & Casualty Co.,* 202 Conn. 190, 202, 520 A.2d 208 (1987); *Colucci* v. *Pinette,* 185 Conn. 483, 489–90, 441 A.2d 575 (1981). Thus, we must uphold the jury's findings of falsity if the evidence is sufficient in respect to any of the defamatory statements made by the defendants. Applying the ordinary standard of appellate review, we conclude that testimony regarding the April 27, 1982 determination of the Association of Assessing Officers and the June 22, 1982 OPM committee report, both of which declared the defamatory accusations untrue, furnished a reasonable basis for the jury's findings of falsity. The general verdict rule makes it unnecessary for us to undertake a sepa-

rate analysis concerning the defendants' particular accusations that the plaintiff violated §§ 12-62 and 12-60.[3]

We next "independently review" the record to determine whether sufficient evidence supports the jury's findings of actual malice. A statement made with actual malice, under the rule of *New York Times Co.,* is made with knowledge of its falsity or with reckless disregard of whether it is false. See *Beckley Newspapers Corporation* v. *Hanks,* 389 U.S. 81, 82–83, 88 S. Ct. 197, 19 L. Ed. 2d 248 (1967). A merely negligent misstatement of fact about a public official retains the constitutional protection afforded free expression. See *Rosenbloom* v. *Metromedia,* 403 U.S. 29, 50, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971); *Rosenblatt* v. *Baer,* 383 U.S. 75, 83–84, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966). Further, proof that a defamatory falsehood has been uttered

[3] In these appeals the defendants, in their joint brief, have inserted a claim that the trial court erred in refusing to submit to the jury a series of interrogatories that had been proposed by the defendant Casazza. See Practice Book § 312. It is within the reasonable discretion of the trial court whether to submit pertinent interrogatories to the jury. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole,* 189 Conn. 518, 527, 457 A.2d 656 (1983); *Freedman* v. *New York, N.H. & H. R. Co.,* 81 Conn. 601, 612, 71 A. 901 (1909). We have recognized, however, that a party has the right to avoid the implication of a general verdict by seeking from the jury answers to appropriate interrogatories. *Ubysz* v. *DiPietro,* 185 Conn. 47, 61–62, 440 A.2d 830 (1981); *Callahan* v. *Jursek,* 100 Conn. 490, 493, 124 A. 31 (1924). The interrogatories proposed by the defendant Casazza would not have involved consideration of each of the accusations that had been made by the defendants. Most notably, no interrogatory sought a jury finding with respect to the accusation that the plaintiff had been responsible for several hundred illegal erasures on the field card records. Therefore, even if the jury's answers to all of the proposed interrogatories had favored the defendants, such results would not necessarily have been in contradiction to a verdict for the plaintiff. Moreover, the failure on the part of Casazza to take exception to the court's refusal, or to the three special interrogatories prepared and submitted to the jury by the court, indicates Casazza's satisfaction at the time that the three interrogatories were adequate to protect his interests. Thus, we conclude that the trial court did not abuse its discretion in refusing to submit the proposed interrogatories to the jury.

"with bad or corrupt motive" or with an intent to inflict harm will not be sufficient to support a finding of actual malice; *Beckley Newspapers Corporation* v. *Hanks,* supra; *Henry* v. *Collins,* 380 U.S. 356, 357, 85 S. Ct. 992, 13 L. Ed. 2d 892 (1965); although such evidence may assist in drawing an inference of knowledge or reckless disregard of falsity. 3 Restatement (Second), Torts § 580A, comment d.

Applying these principles, we are persuaded that the proof presented to show actual malice does possess the convincing clarity that the constitutional standard demands. With respect to Nordquist, the record indicates that, in making several accusations, she relied entirely upon Casazza's advice to her and made no effort independently to verify facts. The following transcript portion, for example, records the examination of Nordquist by counsel for the plaintiff regarding the letter of complaint submitted to the OPM following the April 27, 1982 exoneration of the plaintiff by the Association of Assessing Officers:

"Q. And in that letter, you accused Joan Holbrook of violating two Statutes having to do with assessing?

"A. Yes.

"Q. Statute 12-62 and Statute 12-60, is that correct?

"A. Yes.

"Q. Had you ever read either one of those statutes before you signed that letter?

"A. The first one where it says the changes were made unilaterally, I didn't read the Statute, because I figured this was what it was all about.

"Q. Isn't it true that you never read either one of those Statutes before you made those charges?

"A. Yes sir.

"Q. And isn't it also true that you have never read those Statutes?

"A. Yes.

"Q. Not since the charges were made, you've never resorted to the Statutes?

"A. No.

"Q. And before you sent that charge against Joan Holbrook to O.P.M., you didn't consult a lawyer, did you, and ask his advice about the meaning of the Statutes?

"A. No.

"Q. And you didn't consult any other assessor?

"A. No.

"Q. The only person you consulted with was Titus Casazza?

"A. There were other people that were involved.

"Q. The only person you consulted with in making the charges was Titus Casazza, isn't that true?

"A. Yes sir."

The jury could properly have concluded that a reasonably prudent person in the position of Nordquist, upon learning of the initial exoneration of the plaintiff, would have sought evidence corroborative of Casazza's perspective prior to publishing the subsequent accusations of misconduct in the complaint to the OPM. Viewed in the light of the following additional factors, Nordquist's disregard of the probable falsity of her accusations crosses the threshold from negligence to recklessness. First, the circumstances under which Nordquist embarked upon publishing her claims of wrongdoing suggest the presence of animus. Upon being told by the plaintiff that she "had no business

being an assessor," Nordquist, angered and "reduced to tears," immediately published her accusations to Morrison, the town's first selectman. Second, Nordquist refused to retract her statements after learning of a second official exoneration of the plaintiff, this time by the OPM.[4] A refusal to retract a statement that has been demonstrated to be false and defamatory "might be relevant in showing recklessness at the time the statement was published." 3 Restatement (Second), Torts § 580A, comment d; *Golden Bear Distributing Systems of Texas, Inc.* v. *Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir. 1983). We conclude that the failure of Nordquist to investigate the facts, seek advice from other knowledgeable persons, or publish a retraction after learning of the June 22, 1982 OPM committee report, together with the ill will that seemingly spurred the initial publication of her defamatory statements, evidenced "the high degree of awareness of their probable falsity demanded by *New York Times* . . . ." *Garrison* v. *Louisiana,* 379 U.S. 64, 74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964).

The record similarly supports the finding of actual malice with respect to Casazza. Ill will clearly developed when the plaintiff challenged Casazza about the propriety of using his official position as an assessor in obtaining a reduction in the value of his own property. Like Nordquist, Casazza did not check the avail-

---

[4] The transcript indicates that the examination of Nordquist soon turned to the subject of the plaintiff's demand for retraction:

"Q. Now, after spending a month or a month and a half on their investigation, the [OPM] issued a report in which they exonerated Mrs. Holbrook of the charges that you had made, isn't that true?

"A. Yes.

"Q. And did you thereafter receive a letter from Mrs. Holbrook's attorney . . . in which he called upon you to make a public retraction of the charges that you had published against Mrs. Holbrook?

"A. Yes, I did. . . .

"Q. And you refused to retract your accusation, isn't that also true?

"A. Yes."

able records of the 1971 decennial revaluation, consult an attorney, or seek the advice of other assessors about the validity of his accusations. Following the June 22, 1982 OPM committee report determining that the accusations against the plaintiff were invalid, Casazza not only refused to publish a retraction, but republished his statements in a further complaint filed with the supervisor of the OPM, and also at an interview with a reporter for the Middletown Press, which resulted in an article that elaborated upon the claimed misconduct of the plaintiff. Such evidence supports the conclusion that Casazza recklessly disregarded the probable falsity of his publications. See *Rosenbloom* v. *Metromedia,* supra, 56; *St. Amant* v. *Thompson,* supra, 731.

Because we determine that the evidence was sufficient to support the jury's findings of falsity and malice, we hold that the trial court did not err in denying the defendants' motions to set aside the verdict and render judgment notwithstanding the verdict.

## II

The defendants next claim that the trial court erred in its charge to the jury because the instructions (1) failed adequately to relate the legal element of malice to the particular facts of this case, and (2) did not ask the jury independently to determine whether the plaintiff had made illegal unilateral or substantive changes in the grand list. We disagree.

## A

The court devoted a substantial portion of its jury instructions to the issue of malice. The following excerpts are illustrative. "To recover even for a false, defamatory statement, a public official such as the plaintiff must establish that the statement was made with actual malice; that is, with knowledge that the statement was false or with a reckless disregard for

its truth or falsity . . . . You are by now familiar with the facts in this case. Mrs. Holbrook has several claims she has sought to prove. That the defendants have uttered and published a variety of statements as are outlined in the pleadings that I have referred you to read and to the testimony that you have heard. Let me state these issues again. To establish her claims against a defendant, Mrs. Holbrook must prove three essential elements. . . . Third, that a defendant published an actionable and false, defamatory statement with actual malice; that is, knowing it was false or seriously doubting its truth. And that element requires proof again by the plaintiff by clear and convincing evidence. . . . Actual malice is a legal term which you must not confuse with more common definitions of malice; such as, ill will or hatred. The plaintiff cannot prevail merely by proving that the defendant was motivated by ill will, prejudice, hostility, hatred, contempt or even a desire to injure."

Upon receiving a request from the jury for an explanation of the term "malice" "as applied to this case in writing as clearly as possible in lay terms," the court responded: "In this case for a defendant, for the defendant to have acted with malice means that he must've uttered and published a defamatory statement with knowledge that the statement was false or with a reckless disregard of any evidence or circumstances of its probable falsity." The record indicates that the jury foreman appeared satisfied with this definition, to which the defendants took an exception only on the ground that the court had not restated the burden of proof.

We have stated that the test of a court's charge "is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules

of law." *Atlantic Richfield Co.* v. *Canaan Oil Co.,* 202 Conn. 234, 240, 520 A.2d 1008 (1987); *Borsoi* v. *Spar- ico,* 141 Conn. 366, 371, 106 A.2d 170 (1954). Because the charge was correct in law and ample for the guid- ance of the jury, it met the required test. See *State* v. *Marra,* 195 Conn. 421, 443, 489 A.2d 350 (1985); *DeCarufel* v. *Colonial Trust Co.,* 143 Conn. 18, 20–21, 118 A.2d 798 (1955).

We note that the charge requested by the defendants in respect to malice was no more fact-specific than the charge actually given on that issue, to which the defend- ants took no exception. The defendants requested the following language: "Even if you have found on the basis of the evidence that the plaintiff has proven by clear and convincing evidence, that is, to a high prob- ability, that the statements made about her were false, she is not entitled to prevail in this action unless you also find that the plaintiff has proven to you by clear and convincing evidence that at the time the defend- ant made any or each such false statement, he either knew that the statement was not true, or made the statement with reckless disregard for whether it was true or not . . . . By reckless disregard for the truth or falsity of a defamatory statement, I mean that in order to find for the plaintiff on this basis, you must be convinced that when the defendant made the state- ments in question, he possessed a high degree of aware- ness of their probable falsity." Because the charge requested was in substance given, the defendants cannot prevail in their attack upon the generality of the language used therein. *Atlantic Richfield Co.* v. *Canaan Oil Co.,* supra, 241; *Lowell* v. *Daly,* 148 Conn. 266, 269, 169 A.2d 888 (1961).

B

We are similarly unpersuaded by the defendants' claim that the court erred in failing to instruct the jury

that evidence of the administrative determinations exonerating the plaintiff "was incompetent to establish that the plaintiff had not violated [General Statutes §§ 12-62 and 12-60]." The defendants took no exception to this omission from the charge, but rely upon the failure of the court to charge in accordance with their request. We note that the defendants have not claimed error in the admission of testimony regarding those administrative rulings.

Section six of the defendants' requests to charge consisted of four paragraphs dealing with the defendants' accusations that the plaintiff had made changes in the grand list that were unilateral, in violation of § 12-62, and that were substantive, in violation of § 12-60. The request stated, in respect to each alleged statutory violation, that, if the plaintiff has not proved falsity by clear and convincing evidence, "you must return a verdict for the defendant."

Ordinarily there can be no error in a court's rejection of a request to charge that clearly does not meet the requirements of Practice Book § 318. See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole,* 189 Conn. 518, 527 n.2, 457 A.2d 656 (1983). That rule, which is entitled "Form and Contents of Requests," provides in part that requests to charge the jury "shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based . . . ." Practice Book § 318; see generally *Colucci* v. *Pinette,* 185 Conn. 483, 486–87 n.2, 441 A.2d 574 (1981). This request does not meet these criteria. We have stated that a request containing more than one principle of law violates the rule and was properly refused. See, e.g., *Terminal Taxi Co.* v. *Flynn,* 156 Conn. 313, 320, 240 A.2d 881 (1968); W. Maltbie, Connecticut Appellate Procedure §§ 109, 110.

Additionally, the request to charge included the instruction that, unless the plaintiff has proved the falsity of either alleged statutory violation, "you must return a verdict for the defendant." A verdict for the plaintiff would have been proper, however, had she prevailed in respect to any one of the several claimed defamatory accusations. Because the request was therefore an inaccurate statement of the applicable law, the court was not in error in denying the request to charge. See *State* v. *Chetcuti*, 173 Conn. 165, 171, 377 A.2d 263 (1977); *State* v. *Green*, 172 Conn. 22, 25, 372 A.2d 133 (1976).

In any event, we note that, while the defendants claim error in the court's failure to instruct the jury that evidence of the administrative determinations "was incompetent to establish that the plaintiff had not violated [§§ 12-62 and 12-60]," their request did not include such an instruction. Because the defendants took no exception on the point, this claim was "not distinctly raised at trial"; *State* v. *Rogers*, 199 Conn. 453, 461, 508 A.2d 11 (1986); and we are relieved of any obligation to consider it further. Practice Book § 4185; *Atlantic Richfield Co.* v. *Canaan Oil Co.*, supra, 241; *Kosko* v. *Kohler*, 176 Conn. 383, 389, 407 A.2d 1009 (1978).

### III

A further contention of the defendants is that the trial court erred in refusing to declare a mistrial when the plaintiff's counsel asked Morrison, first selectman of the town, whether he had agreed to pay the defendants' counsel fees. The defendants' objection at trial, renewed on appeal, was that the question "has the effect of leading the jury to believe that [the defendants] are protected by the Town, that their Attorneys' fees are being paid by the Town, and the inference that's going to be drawn by the jury is that the Town

will in effect pay any judgments in this case . . . ." Counsel for the plaintiff responded that the purpose of his question was "to show that the witness is not a neutral and detached person with whom I cannot ask leading questions, but that he is in fact a hostile witness and that his interests are aligned with [the defendants]." While denying the motion for mistrial, the court sustained the objection, and then instructed the jury to disregard the question.

The defendants argue that "[t]he inference that defendants would be indemnified by the Town may be likened to placing information regarding a defendant's insurance coverage before a jury." We have stated that the rule excluding evidence that a defendant carries liability insurance is not without exception. See *Magnon* v. *Glickman,* 185 Conn. 234, 242, 440 A.2d 909 (1981); *Gigliotti* v. *United Illuminating Co.,* 151 Conn. 114, 122, 193 A.2d 718 (1963). " 'It is usually held that it is permissible for plaintiff's counsel, when acting in good faith, to show the relationship between a witness and defendant's insurance company where such evidence tends to show the interest or bias of the witness and affects the weight to be accorded his testimony.' " *Magnon* v. *Glickman,* supra; annot., 4 A.L.R.2d 761, 779.

The trial court has great latitude in ruling on motions for mistrial. *State* v. *Nowakowski,* 188 Conn. 620, 624, 452 A.2d 938 (1982); *State* v. *Perez,* 181 Conn. 299, 310, 435 A.2d 334 (1980). The question before us on appeal is not primarily whether the question posed to Morrison was proper, but whether the trial court, in refusing to grant a mistrial on account of an unanswered question that the jury was instructed to disregard, so far exceeded or abused the discretion committed to it as to warrant our granting a new trial. *State* v. *Couture,* 194 Conn. 530, 562, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d

971 (1985); *State* v. *Laudano,* 74 Conn. 638, 646, 51 A. 860 (1902). The general rule is that a mistrial is granted only where it is apparent to the court that, as a result of some occurrence during trial, a party has been deprived of the opportunity for a fair trial. *State* v. *Gaston,* 198 Conn. 490, 495, 503 A.2d 1157 (1986); *State* v. *DeMatteo,* 186 Conn. 696, 703, 443 A.2d 915 (1982).

Even assuming that the question posed to Morrison was improper, we are not convinced by the defendants' bare assertions that "the court's cautionary instruction was an inadequate cure," and that "the suggestion of indemnification [was] so harmful that a fair trial could not be had." Accordingly, we hold that the court did not abuse its discretion in denying the defendants' motion for a mistrial.

IV

The defendants next claim that the court erred in excluding evidence regarding the sale price of property owned by the plaintiff's husband. The defendants argue that the knowledge they possessed about the sale of the "Patchoug Marina," which occurred some time after the assessment date at a price "substantially higher than the assessed value placed on it by the plaintiff in the 1981 revaluation," was crucial on the issue of actual malice.

It is true that the trial court sustained the plaintiff's objection to "any inquiry of this witness [viz., the defendant Casazza] about the sale and the sales price [as] irrelevant to the issues at hand . . . . " It is clear, however, that the defendants sought to introduce such evidence on the issue of falsity, and not on the issue of malice. The plaintiff's counsel argued at trial that the evidence was inadmissible to show lack of malice on the part of Casazza because he "did not have this information in his possession at the time that he made

the accusations." Counsel for Casazza subsequently stated to the court that the evidence of the sale price of the marina "really goes to the truth of the matter," and that "it should be admissible because the fact that something is true, even if that doesn't come to light until after the statement is made, is still very pertinent." We agree with the defendants' claim at trial that evidence of the sale was relevant to the issue of whether there had been an underassessment of the property by the plaintiff, as the defendants had charged. We agree with the plaintiff, however, that, in the absence of a showing that the defendants were aware of this sale when they made their remarks concerning the plaintiff's exercise of favoritism, the evidence was irrelevant for the purpose of proving the lack of malice.

The defendants have abandoned on appeal the valid ground for the admissibility of the proffered evidence relied upon at trial probably because they recognize that ultimately they suffered no harm from the erroneous ruling. The record indicates that evidence of the sale price was indeed introduced by the defendants during the direct examination of Anthony Viagrande, an officer of the appraisal firm that had assisted in the 1981 revaluation. Viagrande testified several times that the plaintiff had informed him that her husband had sold the marina for $1,200,000. Because the evidence claimed to have been improperly excluded was in fact later admitted, any error resulting from the court's initial ruling was rendered harmless. See *Allen* v. *Nissley,* 184 Conn. 539, 545–46, 440 A.2d 231 (1981).

V

The defendants' final claim is that the court erred in refusing to set aside the damage awards as excessive. The defendants submit that these excessive awards resulted from the court's failure adequately to instruct the jury on the standard of proof to be borne

by the plaintiff with respect to the elements of falsity and actual malice. We are not persuaded that the awards were excessive.

We find no deficiency in the charge given to the jury by the trial court in regard to the plaintiff's burden of proof. The court instructed that the plaintiff "has a more demanding and different burden of proof than preponderance of the evidence on two elements of her claim. She must demonstrate one, that any defamatory statement was false, and two, a defendant acted with actual malice, and both of those claims must be proved by what we call clear and convincing evidence. Clear and convincing evidence is a more exacting standard than proof by a preponderance of the evidence. Clear and convincing proof leaves no substantial doubt in your mind. It is proof that establishes in your mind not only that the proposition at issue is probable, but also that it is highly probable. . . . On the other hand, clear and convincing evidence is not as high a standard as the burden of proof applied in criminal cases, which is proof beyond a reasonable doubt. It is enough that the plaintiff in this case establishes falsity or actual malice beyond any substantial doubt. She does not have to dispel every reasonable doubt. . . .

"To establish her claims against a defendant, Mrs. Holbrook must prove three essential elements. First, that the challenged statements are defamatory of her in some actionable way and were uttered and published by a defendant. That issue must be proved by her by a preponderance of the evidence. Second, that any actionable, defamatory statement is false in some material respect. That burden is by clear and convincing evidence. Third, that a defendant published an actionable and false, defamatory statement with actual malice; that is, knowing it was false or seriously doubting its truth. And that element requires proof again by the plaintiff by clear and convincing evidence."

These jury instructions conformed to the defendants' requests to charge, are sufficiently correct in law;[5] see *Gertz* v. *Robert Welch, Inc.,* supra, 342; *Rosenbloom* v. *Metromedia,* supra, 30; *Dacey* v. *Connecticut Bar Assn.,* 170 Conn. 520, 534–38, 368 A.2d 125 (1976); and furnished adequate guidance for the jury. See generally *Atlantic Richfield Co.* v. *Canaan Oil Co.,* supra, 240. Therefore, we cannot agree with the defendants that such instructions misled the jury into awarding excessive damages.

We next examine the damage awards returned by the jury. The jury returned a verdict against Casazza for $21,000 in general damages, $135,750 in special damages, and $58,111 in exemplary damages. Against the defendant Nordquist the jury returned a verdict for $7000 in general damages, $45,250 in special damages, and $19,366 in exemplary damages. The court ordered remittiturs on the exemplary damages awards in the amounts of $2874 and $954 in regard to Casazza and Nordquist, respectively. Thus, the defendant Casazza was responsible for 75 percent, and the defendant Nordquist for 25 percent, of the aggregate damages awarded to the plaintiff.

"Assessment of damages is peculiarly within the province of the jury and their determination should be

---

[5] We note that the propriety of that portion of the jury charge placing the burden of proving falsity upon the plaintiff by clear and convincing evidence is not at issue in this appeal. "At common law, prior to the application of constitutional standards in the area of libel and slander, the truth of the defamatory statement was an affirmative defense for the defendant to prove. Restatement of Torts §§ 518, 613 (2) (1938). Although falsity was an element of a cause of action for defamation, id. at § 558, once a statement was shown to be defamatory, falsity was presumed. Prosser, Torts § 116 (4th Ed. 1971). . . . The language of *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), and later cases makes clear that the burden of demonstrating the falsity of the defamatory statement rests on the plaintiff when the malice standard applies." *Wilson* v. *Scripps-Howard Broadcasting Co.,* 642 F.2d 371, 374–75 (6th Cir. 1981).

set aside only when the verdict is plainly excessive and exorbitant." *Wochek* v. *Foley,* 193 Conn. 582, 586, 477 A.2d 1015 (1984); *Szivos* v. *Leonard,* 113 Conn. 522, 525, 155 A. 637 (1931). "The only practical test to apply to a verdict is whether the award of damages falls somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case, or whether the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption. *Briggs* v. *Becker,* 101 Conn. 62, 66, 124 A. 826 [1924]." *Slabinski* v. *Dix,* 138 Conn. 625, 629, 88 A.2d 115 (1952). Evidence offered at trial relevant to damages must be reviewed in the light most favorable to sustaining the verdict. See *Wochek* v. *Foley,* supra, 587; *Gorczyca* v. *New York, N.H. & H. R. Co.,* 141 Conn. 701, 703–704, 109 A.2d 589 (1954).

The exemplary damages awards in the present cases were properly limited to attorney's fees, which were based on a one third contingency fee agreement and costs. See *Kenny* v. *Civil Service Commission,* 197 Conn. 270, 277, 496 A.2d 956 (1985); *Alaimo* v. *Royer,* 188 Conn. 36, 42, 448 A.2d 207 (1982); see also *Gertz* v. *Robert Welch, Inc.,* supra, 348–50. Apart from these awards, the plaintiff received a verdict for an aggregate amount of $28,000 in general damages and $181,000 in special damages. There was testimony at trial from Gary Crakes, an economist, that the plaintiff had sustained a "total net discounted loss" of $181,571. The plaintiff sought damages based not only upon pecuniary loss, but also public humiliation, mental anguish, and pain and suffering. An award of such general damages cannot have been the product of precise calculations and is given considerable deference by a reviewing court. See *Campbell* v. *Gould,* 194 Conn. 35, 42, 478 A.2d 596 (1984).

It is clear that, under these circumstances, the awards of damages fall "somewhere within the neces-

sarily uncertain limits of fair and reasonable compensation," and may be seen as reasonably related to the evidence adduced at trial. "The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be given in favor of its correctness." *Katsetos* v. *Nolan,* 170 Conn. 637, 656, 368 A.2d 172 (1976); see *Herb* v. *Kerr,* 190 Conn. 136, 139, 459 A.2d 521 (1983). Accordingly, we find no error in the refusal of the trial court to set aside the damage awards as excessive.

There is no error.

In this opinion the other justices concurred.