## John Dow, Jr. *v.* New Haven Independent, Inc., et al.

Superior Court     Judicial District of     File No. 257261
New Haven

Memorandum filed September 11, 1987

*Friedler, Kaplan & Harper,* for the plaintiff.

*Byelas & Neigher* and *Coan, Levendon & Royston,* for the defendants.

*Wiggin & Dana,* for Jackson Newspapers, Inc., as amicus curiae.

*Martin Margulies,* for the Connecticut Civil Liberties Union, as amicus curiae.

BERDON, J. In this action for libel brought by the plaintiff, John Dow, Jr., because of an allegedly libelous newspaper article published by the named defendant, the New Haven Independent, Inc., the defendants[1] seek summary judgment. The defendants' motion for summary judgment is predicated on three of their five special defenses:[2] (1) the statements are not libelous

---

[1] In addition to the New Haven Independent, Inc., the other defendants are the following officers of the corporation: Cynthia Savo, president, director and publisher of the New Haven Independent, Paul Bass, vice president and director, Carole Bass, secretary and director and Bruce Shapiro, treasurer and director.

[2] The other two special defenses are that the facts set forth in the editorial are true or substantially true, and that the "plaintiff, as a public figure or a private figure involved in an issue of public concern, is unable to show that the editorial in question was published by the defendant with actual malice."

as a matter of law; (2) they are opinions protected by the state and federal constitutions; (3) they are comments protected by the common law privilege of fair comment. The court need not determine whether the statements come within the common law protection of fair comment, since the motion must be granted because the offending statements are either not libelous as a matter of law or are constitutionally protected opinion.

The plaintiff is the superintendent of the New Haven public schools. The defendants publish the New Haven Independent, a weekly newspaper with a general circulation in the New Haven area. This action for libel is based upon an editorial that appeared on the opinion-editorial page of the March 12, 1987 issue of the New Haven Independent in which Dow was criticized for his position on acquired immune deficiency syndrome (AIDS) and his demand for an advance deposit of $20,000 before he would allow a reporter to review his official correspondence. The full text of the editorial, clearly entitled "Opinion" and "Editorial," appears in the appendix attached to this opinion.

The background of the editorial is not in dispute. First, Dow has taken the position that "if youngsters have AIDS and we are aware of it, we are educating them outside the regular school environment," which he stated when interviewed on Connecticut Public Radio's "Open Air" program hosted by Faith Middleton on January 13, 1987. Second, in that same interview, Dow admitted that he had no formal policy on AIDS education.[3] Third, when a reporter for the New Haven Reg-

---

[3] "[Faith Middleton]: What about AIDS education? New Haven has one of the highest AIDS rates. And as we've stated, teenage pregnancy rates in the city are extremely high, so we know there's a lot of sexual activity. There's significant drug use. All of these activities are high risk for AIDS. In light of this, do you have a formal AIDS education policy for the school system? Do you have one planned?

"[Dow]: No, we have not developed a formal AIDS policy."

ister, a daily newspaper with general circulation in the New Haven area, requested to see "all public letters to and from citizens, city officials and state officials on a weekly basis," Dow, on February 25, 1987, responded in part as follows: "Please be informed that my office will do its best to accommodate your request of January 23, 1987, as clarified in your above noted correspondence. However, as I indicated to you in a prior letter, we will require payment, in advance, for personnel needed to review the correspondence requested in order to insure that privacy and other rights of affected persons are not compromised. Therefore, we require an initial advance payment of $20,000 per year (salary and fringes) in order to commence compliance with your request and will forward additional billing as further costs arise for copying and fees for legal opinions."[4]

Specifically, after separating his own embellishments on the language used in the editorial, Dow complains that the following statements are libelous: (1) Dow has "backward views on pupils with AIDS and on education about the disease"; (2) Dow "has been looking more like an ignorant and spineless politician than an educational leader"; (3) Dow is "trying to block a New Haven Register reporter from routine examination of his correspondence files by demanding a $20,000 down payment"; (4) Dow is "seeking to thwart" freedom of information laws; (5) "The law is clear: Any but the most sensitive of municipal correspondence should be easily available to the public"; (6) "Five-figure 'handling fees' are an almost laughable challenge to open government"; and (7) "Dow should go back to elementary school and take a civics class."[5]

[4] The record is not clear whether the request by the Register's reporter to inspect the information was connected with the superintendent's policy on AIDS.

[5] In addition, Dow alleges that the editorial implied that "the plaintiff would take official action in ignorance of applicable law or without seek-

The court views the motion for summary judgment in the context of the seminal case of *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), when determining the demarcation between speech about public officials and figures that is constitutionally protected by the first amendment and speech that may be legitimately regulated to protect the reputation of an individual. In this case, Dow, as the superintendent of public schools in the city of New Haven, is a public official. See *Holbrook* v. *Casazza,* 204 Conn. 336, 342, 528 A.2d 774 (1987), cert. denied, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988). The subject matter of the statements concerns the plaintiff in his official capacity and clearly presents issues of public importance.

It is essential to our democracy, as made clear in *New York Times Co.* v. *Sullivan,* supra, that our primary concern must be the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." Id., 270. Indeed, the language used in the editorial in this case—for example, that Dow looked more like "an ignorant and spineless politician," that he had "backward views" and that he "should go back to elementary school and take a civics class"—is vehement, caustic and unpleasant, but that does not make it libelous under the law.

A public official must expect, in a society that guarantees free speech, that at times he or she will be the subject of rhetorical hyperbole. Nevertheless, that alone cannot be the basis for an action for libel. In his con-

---

ing legal advice as to same, or would proceed in knowledgeable derogation of applicable law." The court is unable to infer this from the editorial, and, even if it could, the court would find that it is protected opinion.

curring opinion in *New York Times Co.* v. *Sullivan,* supra, Justice Black, arguing for an absolute, unconditional constitutional privilege, wrote: "This Nation of ours elects many of its important officials [and appoints important officials through those elected]; so do the States, the municipalities, the counties and even many precincts. These officials are responsible to the people for the way they perform their duties. While our Court has held that some kinds of speech and writings, such as 'obscenity' . . . and 'fighting words' . . . are not expression within the protection of the First Amendment, freedom to discuss public affairs and public officials is unquestionably, as the Court today holds, the kind of speech the First Amendment was primarily designed to keep within the area of free discussion. To punish the exercise of this right to discuss public affairs or to penalize it through libel judgments is to abridge or shut off discussion of the very kind most needed. This Nation, I suspect, can live in peace without libel suits based on public discussions of public affairs and public officials. But I doubt that a country can live in freedom where its people can be made to suffer physically or financially for criticizing their government, its actions, or its officials. 'For a representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents; and this happens whenever the constituent can be restrained in any manner from speaking, writing, or publishing his opinions upon any public measure, or upon the conduct of those who may advise or execute it.' An unconditional right to say what one pleases about public affairs is what I consider to be the minimum guarantee of the First Amendment." (Citations omitted.) Id., 296–97 (Black, J., concurring).

# I

## DEFAMATORY WORDS

It is clear that before "a party will be held liable for libel, there must be an unprivileged publication of a false and defamatory statement." *Strada* v. *Connecticut Newspapers, Inc.,* 193 Conn. 313, 316, 477 A.2d 1005 (1984). A "communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. In the application of this idea it is enough that the communication would tend to prejudice the plaintiff in the eyes of a substantial and respectable minority, but in such a case it must be shown that the communication did reach one or more persons of that minority group. This would normally be presumed, if the communication was a public one which was made in the newspaper or over radio or television." Prosser & Keeton, Torts (5th Ed.) p. 774; *Burns* v. *Telegram Publishing Co.,* 89 Conn. 549, 552, 94 A. 917 (1915). "[I]f the alleged defamatory words could not reasonably be considered defamatory in any sense, the matter becomes an issue of law for the court." *Charles Parker Co.* v. *Silver City Crystal Co.,* 142 Conn. 605, 612, 116 A.2d 440 (1955). When such a determination is made, the words that are claimed to be defamatory are given their natural and ordinary meaning and are taken as reasonable persons would understand them. *Ventresca* v. *Kissner,* 105 Conn. 533, 535, 136 A.2d 90 (1927). Moreover, the words must be viewed in the context of the entire editorial. *Yavis* v. *Sullivan,* 137 Conn. 253, 259, 76 A.2d 99 (1950).

At least that portion of the statement to the effect that Dow was demanding a "$20,000 down payment" for a routine examination of his correspondence and the statement that the law was clear that "[a]ny but

the most sensitive of municipal correspondence should be easily available to the public" are not defamatory. They are not defamatory, taken alone, or placed in the context of the entire editorial. Furthermore, Dow concedes that he made such a demand for the $20,000.[6]

## II

### FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

In *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 74 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), the United States Supreme Court made it clear that pure opinion is protected. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Id., 339–40.

The *Gertz* court went on to hold, however, that "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues." Id., 340. By this statement and qualification, the Supreme Court raised to a level where they are absolutely protected by the first amendment "opinions," which previously under the common law were subject only to a qualified privilege of fair comment. *Hotchner* v. *Castillo-Puche*, 551 F.2d 910, 913 (2d Cir.), cert. denied, 434 U.S. 834, 98 S. Ct. 120, 54 L. Ed. 2d 95 (1977).

The determination of whether a specific statement is one of opinion or fact is difficult. The Supreme Court

---

[6] Indeed, counsel conceded at oral argument that Dow had no right to demand a search fee under the Freedom of Information Act, but only the costs of producing a copy of any document requested. At the statutory maximum of twenty-five cents per page; General Statutes § 1-15; the superintendent of schools was in effect demanding an advance payment for 80,000 copies when the reporter from the Register had not requested a single copy.

in *Gertz* furnished no guidelines for making that determination and courts have gone in all directions. Some courts have held it to be a judgment call, others have selected a single determinative factor, and still others have adopted a multifactor test. *Ollman* v. *Evans,* 750 F.2d 970, 977 (D.C. Cir. 1984) (en banc). Clearly, however, it is a question of law for the court to determine.[7] *Mr. Chow of New York* v. *Ste. Jour Azur S.A.,* 759 F.2d 219, 224 (2d Cir. 1985). It is also clear, that when the court makes it determination, it does not look at the statements through the plaintiff's lens; *Buckley* v. *Littell,* 539 F.2d 882, 893–94 n.11 (2d Cir. 1976), cert. denied, 429 U.S. 1062, 97 S. Ct. 785, 50 L. Ed. 2d 777 (1977); but rather they must be viewed from the perspective of an "ordinary reader." *Mr. Chow of New York* v. *Ste. Jour Azur S.A.,* supra.

Some statements clearly fall within the protection of the first amendment and have been referred to as "pure" opinions. This is the type where the defendant states the fact upon which he or she bases the opinion, or the opinion is based upon facts that are common knowledge, or the facts upon which the opinion is based are readily accessible to the recipient. *Goodrich* v. *Waterbury Republican-American, Inc.,* 188 Conn. 107, 117–18, 438 A.2d 1317 (1982); see 3 Restatement (Second), Torts § 566, comment b.

The statements made in the editorial upon which Dow bases his action are pure opinions and are thereby constitutionally protected. A fair reading of the editorial indicates the statements that Dow has "backward

---

[7] It is essential that a court make this determination. "[T]he predictability of decisions, which is of crucial importance in an area of law touching upon First Amendment values, is enhanced when the determination is made according to announced legal standards and when a body of public case law furnishes published examples of the manner in which these standards are to be applied." *Ollman* v. *Evans,* 750 F.2d 970, 978 (D.C. Cir. 1984) (en banc).

views on pupils with AIDS and on education about the disease" and that "he has been looking more like an ignorant and spineless politician than an educational leader" are the "pure" type opinions of Dow's policy of requiring children with AIDS to receive their education outside the classroom[8] and that he does not have a formal AIDS education policy. These facts of how children with AIDS are to be educated and the lack of an education policy, which Dow concedes to be true, were not stated in the editorial but are matters of common knowledge,[9] were clearly stated by him in the interview on Connecticut Public Radio's "Open Air" program on January 13, 1987, and were subsequently published in the New Haven Independent, and are also the subject of at least one other newspaper article.

The opinions that Dow is "trying to block a New Haven Register reporter from routine examination of his correspondence," that he is attempting to "thwart" the freedom of information laws, and that his demand for "[f]ive-figure 'handling fees' are an almost laughable challenge to open government," clearly refer to his demand that a reporter make an advance payment of $20,000 before Dow would make his official correspondence available. There was specific reference in the editorial to the fact that he demanded this payment, which Dow concedes he did in a letter to the reporter dated February 15, 1987. Furthermore, this was the subject of other newspaper articles and was common knowledge.

Finally, the statement in the editorial that "Dow should go back to elementary school and take a civics

---

[8] Dow argues that the policy regarding children with AIDS is authorized and mandated by § 10-210 of the General Statutes. Whether the policy of the superintendent of schools is justified by a statute is irrelevant to the issues raised in this action for libel.

[9] Dow admitted that his position was common knowledge. In the "Open Air" interview he stated "[e]veryone knows what our position is."

class" is an opinion obviously based upon the above mentioned facts about his AIDS policy, lack of AIDS educational policy and his demand for a $20,000 advance payment.

Even if these statements could not be classified as pure opinion, it is clear that they are protected by the first amendment. Two years after *Goodrich* v. *Waterbury Republican-American, Inc.,* supra, was decided by the Supreme Court of Connecticut, a more comprehensive analysis to test whether a statement is protected opinion or fact was adopted in *Ollman* v. *Evans,* supra. The *Ollman* court recognized that in most instances it was impossible to establish a "bright-line or mechanical distinction" between fact and opinion. Id., 978. The test adopted was as follows: "*First,* we will analyze the common usage or meaning of the specific language of the challenged statement itself. Our analysis of the specific language under scrutiny will be aimed at determining whether the statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous. . . . Readers are, in our judgment, considerably less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning. *Second,* we will consider the statement's verifiability—is the statement capable of being objectively characterized as true or false? . . . Insofar as a statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content. And, in the setting of litigation, the trier of fact obliged in a defamation action to assess the truth of an unverifiable statement will have considerable difficulty returning a verdict based upon anything but speculation. *Third,* moving from the challenged language itself, we will consider the full context of the statement—the entire article or column, for example—inasmuch as other, unchallenged language

surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content. . . . *Finally,* we will consider the broader context or setting in which the statement appears. Different types of writing have, as we shall more fully see, widely varying social conventions which signal to the reader the likelihood of [a] statement's being either fact or opinion." (Citations omitted; emphasis added.) Id., 979.

Applying the *Ollman* analysis to the statements in this case, the court comes to the same conclusion that they are protected opinions entitled to an absolute privilege. Surely, the average reader would not infer any facts from the language that Dow has "backward views on pupils with AIDS, and on education about the disease," that he looks more like an "ignorant spineless politician than an educational leader," that he is "trying to block a New Haven Register reporter" from obtaining information, that he is "seeking to thwart" freedom of information laws, that his demand for "[f]ive-figure 'handling fees' [is] an almost laughable challenge to open government," and that he should "go back to elementary school and take a civics class." The language is clearly opinion and does not purport to be fact because the statements are indefinite and ambiguous.

Nor are any of these statements objectively capable of proof or disproof. They may be unpleasant for Dow, but that is not the test for determining whether they are fact or opinion. They are just vague statements of opinion that the average person would perceive as merely being used in a loose manner and not readily verifiable.

A view of the entire editorial could only lead a person to believe that these were the opinions of the newspaper. No reader would take any of the statements

literally. The absurdity is clearly demonstrated by the statement that the superintendent of the entire school system who has his doctorate degree should go back to elementary school. What the Supreme Court of the United States has stated in reference to a published statement characterizing a plaintiff-legislator's negotiations as "blackmail" has equal application here. "[E]ven the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who consider [the plaintiff's] negotiating position extremely unreasonable." *Greenblelt Cooperative Publishing Assn.* v. *Bresler,* 398 U.S. 6, 14, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970).

Finally, the statements are contained in an editorial on the opinion-editorial page, which is of great significance. It is clearly entitled opinion and editorial in bold and outstanding letters. And it is obvious that editorial has its common, ordinary and elementary meaning—that is, an article in a publication expressing the *opinion* of its editors or publishers. Indeed, the present editorial is mild compared to the editorial comments about another newspaper and its editor that could not survive summary judgment. In *Loeb* v. *Globe Newspaper Co.,* 489 F. Sup. 481 (D. Mass. 1980), the defendant newspaper described the plaintiff newspaper as " 'probably the worst newspaper in America,' " and stated that it was " 'a newspaper by paranoids for paranoids.' " It accused the plaintiff editor of having "been fined three million dollars in a prior legal action, [and stated] that he 'edits his paper like a 19th Century yellow journal,' that his views are 'venomous' and that his newspaper is a 'daily drip of venom.' " Id., 483. In addition, the plaintiff editor complained about the defendant newspaper cartoon "in which he was depicted with a cuckoo springing from his forehead." Id. The court, in holding that the statements were opinion and not actionable, stated that "the balance between a right

of action for defamation and the right of editorial free-
dom is struck with greater deference to the freedom
of the editorial privilege." Id., 484–85. Similarly, the
court in *National Rifle Assn.* v. *Dayton Newspapers,
Inc.,* 555 F. Sup. 1299 (S.D. Ohio 1983), held that an
editorial that stated that the plaintiff " 'happily encour-
ages murders and robberies' " was protected opinion.
Id., 1301.

## III

### SECTIONS 4 AND 5 OF ARTICLE FIRST OF THE CONSTITUTION OF THE STATE OF CONNECTICUT

The defendants also claim the protection of the state
constitution. It is clear that the state constitution not
only protects opinion to the same extent as the federal
constitution, but goes further. In construing the state
charter of liberties, this court must put to rest "the
notion that state constitutional provisions were adopted
to mirror the federal Bill of Rights." W. Brennan,
"State Constitutions and the Protection of Individual
Rights," 90 Harv. L. Rev. 489, 501 (1977). "We are
. . . free, in appropriate circumstances, to follow a
different route and thus to recognize that the Connect-
icut constitution may provide for the people of this state
greater rights and liberties than they are afforded
under the federal constitution." *State* v. *Fleming,* 198
Conn. 255, 261, 502 A.2d 886, cert. denied, 475 U.S.
1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986).

Almost ninety years ago, in *State* v. *McKee,* 73 Conn.
18, 28, 46 A. 409 (1900), the Supreme Court of Con-
necticut held: "The primary meaning of 'liberty of the
press,' as understood at the time our early constitu-
tions were framed, was freedom from any censorship
of the press; from 'all such previous restraints upon
publications as had been practiced by other govern-
ments, and in early times here, to stifle the efforts of
patriots towards enlightening their fellow subjects upon

their rights and the duties of rulers.' *Com.* v. *Blanding,* 3 Pick. [20 Mass.] 304, 313 [1825]. *But this fundamental guaranty goes further;* it recognizes the free expression of opinion on matters of church or State as essential to the successful operation of free government, and it also recognizes the free expression of opinion on any subject as essential to a condition of civil liberty. The right to discuss public matters stands in part on the necessity of that right to the operation of a government by the people . . . ." (Emphasis added.) "It must be kept in mind that '[c]riticism of those responsible for government operations must be free, lest criticism of government itself be penalized.' *Rosenblatt* v. *Baer,* 383 U.S. 75, 85, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966)." *Brown* v. *K.N.D. Corporation,* 205 Conn. 8, 16, 529 A.2d 1292 (1987). Furthermore, almost a decade before *New York Times Co.* v. *Sullivan,* supra, was decided, the Connecticut Supreme Court recognized the implications of the libel and slander laws on the state constitution's right of free speech and press. The court cautioned in *Charles Parker Co.* v. *Silver City Crystal Co.,* supra, 615, that "[c]ourts must be careful not to permit the law of libel and slander to encroach unwarrantably upon the field of free public debate."

Because of the profound commitment to freedom of the press as demonstrated in §§ 4[10] and 5[11] of article first of the constitution of the state of Connecticut and the history of this state, at the very least, statements in editorials (clearly labeled as such) about public officials concerning matters of public concern, such as the editorial on Dow in this case, are entitled to an absolute, unconditional privilege. The adoption of an absolute privilege under the state constitution for such

[10] "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

[11] "No law shall ever be passed to curtail or restrain the liberty of speech or of the press."

editorial writings strikes the necessary constitutional balance between a free press unfettered by the threat of litigation and the reputation of the public official that can be adequately protected in the public forum he or she commands. The label of editorial by the press clearly puts the world on notice that this is merely the opinion of the press (regardless of whether it is a written editorial appearing in a newspaper or an editorial spoken by a broadcaster). Equally important, such a constitutional rule will diminish the heavy cost of litigation that can burden a free press.[12]

Justice Goldberg, urging in his concurring opinion in *New York Times Co.* v. *Sullivan,* supra, that the court adopt an "absolute, unconditional privilege to criticize official conduct despite the harm which may flow from excesses and abuses," wrote the following, which is pertinent to the state constitution. "The prized American right 'to speak one's mind' . . . about public officials and affairs needs 'breathing space to survive' . . . . The right should not depend upon a probing by the jury of the motivation of the citizen or press. The theory of our Constitution is that every citizen may speak his mind and every newspaper express its view on matters of public concern and may not be barred from speaking or publishing because those in control of government think that what is said or written is unwise, unfair, false, or malicious. In a democratic society, one who assumes to act for the citizens in an executive, legislative, or judicial capacity must expect that his official acts will be commented upon and criticized. Such criticism cannot, in my opinion, be muzzled or deterred by the courts at the instance of public officials under the label of libel." (Citations omitted.) *New York Times Co.* v. *Sullivan,* supra, 298–99 (Goldberg, J., concurring).

---

[12] See part IV of this memorandum of decision.

## IV

### Summary Judgment

Dow argues that summary judgment should not enter because he intends to demonstrate through discovery that the "statements contained in the editorial with respect to the Plaintiff's policy concerning children with AIDS and his response to the New Haven Register's request to examine his office correspondence are maliciously false and/or suffer from a malicious omission of material facts." There are two simple answers to this argument. First, the *facts* concerning Dow's school admission policy toward children with AIDS and his official response to the reporter from the New Haven Register are admitted by the documents he submitted in support of his objections to the motion. He obviously confuses the opinions with the facts. Second, whether the statements are defamatory and whether they are fact or opinion are questions of law for the court as previously indicated in this opinion.

There is significant empirical data to suggest that the costs of defending defamation litigation have caused newspapers to soften or abandon coverage of controversial issues. "Whether a suit is settled, won, or lost, the legal fees alone can be chilling." R. Smolla, "Let the Author Beware: The Rejuvenation of the American Laws of Libel," 132 U. Pa. L. Rev. 1, 13 (1983). "The desultory pace of this . . . litigation gives little comfort to those who would assert their constitutional right to free speech about public affairs. This is especially true of the many smaller journals and local newspapers which have played an important role in the affairs of [a state] but which cannot withstand high litigation costs." *Maressa* v. *New Jersey Monthly,* 89 N.J. 176, 196, 445 A.2d 376 (1982). The public loses in such circumstances; it results in self-censorship by the press

to avoid incurring substantial fees especially by those small newspapers who cannot bear the costs. Note, "Media Counteractions: Restoring the Balance to Modern Libel Law," 75 Geo. L.J. 315 (1986). An intimidated press is a threat to our democracy.

Of course, the constitutional rights of freedom of the press must not be allowed to infringe on the constitutional right that all courts be open to redress an injury. Conn. Const., art. I, § 10. An appropriate vehicle to accommodate a balance between these rights is a motion for summary judgment. "Our courts should resolve free speech litigation more expeditiously whenever possible. The perpetuation of meritless actions, with their attendant costs, chills the exercise of press freedom. To avoid this, trial courts should not hesitate to use summary judgment procedures where appropriate to bring such actions to a speedy end." *Maressa* v. *New Jersey Monthly,* supra. Indeed, Connecticut should take additional steps to protect the public's right to a free press. See note, "Media Counteractions: Restoring the Balance to Modern Libel Law," supra, 336.

The motion for summary judgment in favor of the defendants is hereby granted and costs may be taxed against the plaintiff.

## APPENDIX

### "Dow Strikes Again

"Schools Superintendent John Dow started his New Haven career with a proper emphasis on excellence, but lately he has been looking more like an ignorant and spineless politician than an educational leader. A few weeks ago, we noted his backward views on pupils with AIDS and on education about the disease. Now comes the news that he's trying to block a New Haven Register reporter from routine examination of his correspondence files by demanding a $20,000 down payment.

"Government accountability is a [sic] one of the first principles taught in social studies. It's also the guiding force behind Connecticut's admirable Freedom of Information law, which Dow is seeking to thwart. The law is clear: any but the most sensitive of municipal correspondence should be easily available to the public. Five-figure 'handling fees' are an almost laughable challenge to open government.

"Dow should go back to elementary school and take a civics class. In the meantime, his students can watch while he tries to justify a paranoid and arrogant policy before a skeptical Freedom of Information Commission. They'll get a valuable lesson on how democracy works—at their superintendent's expense."