[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISIONSTATEMENT OF THE CASE
This is an action instituted by the plaintiffs Anton Nemeth, Carol Nemeth and New Dimensions, Inc. seeking damages against the defendant Robert Carroll. The Amended Complaint is in thirteen counts, but three counts were withdrawn at the end of the trial. The second, third, fifth, seventh and ninth counts of the Amended Complaint are based on slander per se; the fourth, sixth, eighth and tenth counts are based on slander; and the thirteenth count is based on the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110(b) et seq. ("CUTPA"). The case was tried before the court without a jury. The court makes the following findings.
New Dimensions, Inc. is a women's fitness and exercise center owned and operated by Anton and Carol Nemeth since June 1989. New Dimensions is located in a commercial building owned by Mr. Nemeth at 1757 Blackrock Turnpike, Fairfield, Connecticut. Prior to June 1989, Mr. Nemeth leased this space to another fitness center called Spa Lady. Spa Lady closed in May 1990 in a hurried and suspicious manner. The owner of Spa Lady also owned two other such spas in Connecticut which were sold. The Fairfield Spa Lady was not sold, but closed very abruptly without any prior notice and without leaving its members with any services or reimbursement. Rather than finding a new tenant, Mr. Nemeth decided to reopen the spa as New Dimensions with the assistance of his wife, Carol Nemeth.
Beginning in late 1989 and continuing through the middle of 1990, Mr. Nemeth experienced financial difficulties. People's Bank held the mortgage on Nemeth's commercial property and his financial problems caused him to fall behind on his mortgage payments. In March 1990, the bank exercised its rights under an assignment of rents demanding that all tenants of Nemeth's commercial property, including the Gun Rack and New Dimensions, pay the rent to the bank. There is conflicting testimony about the sheriff serving the tenants with the bank's rent demand in a loud and boisterous manner, but in any event, the court finds that the rental assignment asserted by the bank was not a private or confidential matter, but was a public act subject to general CT Page 3360 knowledge and discussion.
On or about June 9, 1990, Mr. Nemeth was served with documents notifying him that People's Bank was instituting foreclosure proceedings. As part of this action, the bank also sought a temporary restraining order directing Nemeth to provide "essential services" to his tenants. The restraining order request was based on an affidavit supplied by defendant Carroll's wife asserting various complaints against Nemeth including the alleged failure to provide sufficient air conditioning. Nemeth and the bank reached an agreement soon after the foreclosure action was instituted and the lawsuit was withdrawn on or about June 20, 1990.
The defendant, Robert Carroll, was the president of a business called Gun Rack, Ltd., which was a sporting goods store specializing in the sale of firearms. Gun Rack signed a lease with Mr. Nemeth and became a tenant in the commercial property in November, 1981. Beginning in 1989, the relationship between Mr. Nemeth and Carroll became very bitter and hostile. Their first dispute was about a display sign which Carroll placed on the property advertising Gun Rack's business. Nemeth believed that the sign was too large and gaudy, but despite their discussions and agreements, with and without legal counsel, the sign was never removed. This controversy was followed by an even more bitter dispute regarding the room temperature in the Gun Rack premises. Carroll had installed large display cabinets with high-intensity lighting. These lights increased Gun Rack's air conditioning needs which Nemeth was unable to satisfy. Nemeth and Carroll never satisfactorily resolved this air conditioning dispute. The Gun Rack filed a lawsuit against Nemeth in September 1990, which was subsequently withdrawn. In May 1991, Carroll relocated the Gun Rack business and Nemeth sued him for breach of lease. This lawsuit resulted in a judgment in favor of Nemeth against the Gun Rack and Carroll individually as a guarantor under the lease.
The foregoing provides the background for the allegations forming the crux of plaintiffs' factual claims. On or about December 1990, Mr. Nemeth was asked by a friend whether he or his business was in financial trouble. During the following months in 1991, Mr. Nemeth was asked similar questions from acquaintances and club members concerning whether New Dimensions was in financial trouble, was in foreclosure or was going to close. The plaintiff called two witnesses who were members of New Dimensions CT Page 3361 in 1991, Lia Vigorita and Claire Schimpf, who both testified that they heard rumors that New Dimensions was having financial difficulties and that these rumors were being discussed among other members of the club. The Nemeths and Laura Dorr, New Dimensions' manager, testified that in 1991 these rumors began to affect New Dimensions' business: prospective members appeared unwilling to commit to long term contracts; and the number of people joining the club or renewing their contracts appeared to be below expectations. These rumors peaked in mid to late 1991 and then began to decrease until they were minimal or insignificant in the early part of 1992.
The plaintiff claims that the false rumors about New Dimensions' financial viability originated from and were being disseminated by the defendant, Robert Carroll. The plaintiff submitted the deposition testimony of Tate O'Leary. O'Leary was a member of New Dimensions and waitress at a nearby restaurant. In May 1991, Carroll was a patron at the restaurant and was served by O'Leary. In response to her comment to Carroll indicating that she was member of New Dimensions, Carroll told her: that New Dimensions was in foreclosure and had been in foreclosure before; that the club was going to close; and that Mr. Nemeth had shut off the electricity and air conditioning of the Gun Rack which would force the Gun Rack to leave the premises.
Another witness Cesar Rincon operated a cleaning business and Nemeth was one or Rincon's clients. Rincon testified that sometime between 1990 and 1991 Carroll told him that New Dimensions was in foreclosure and that Rincon should be careful because he might not be paid. Laura Dorr also testified that in 1991 Carroll told her that New Dimensions was in foreclosure and would be closing. At the trial, Carroll denied making these statements to these witnesses or to anyone else. The court credits the testimonies of O'Leary, Rincon and Dorr and finds that Carroll made the statements to them.[1] More specifically, the court finds that Carroll said: that New Dimensions was having financial difficulties; that New Dimensions was involved in foreclosure proceedings; that the club might close; and that his business, the Gun Rack, was not being provided desired air conditioning. There is no dispute that New Dimensions was not involved in foreclosure proceedings, was not having significant financial problems and was not going to close, although New Dimensions' principal, Mr. Nemeth, did have some financial difficulties and did have foreclosure proceedings instituted against him. There was ill will between Nemeth and Carroll which CT Page 3362 motivated Carroll to make these negative statements about New Dimensions. Except as noted above, the plaintiffs did not call any other club members who testified that Carroll made derogatory comments to them about the club. The plaintiffs also did not offer testimony from any club member indicating that she failed to join, failed to renew, or decided to terminate her membership because of the rumors. Indeed, none of the club members called as witnesses testified that they terminated their membership or otherwise acted differently regarding their membership because of any rumors they had heard.
 DISCUSSION A Defamation Claims
I. Slander Per Se
A statement is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with." Dow v. New Haven Independent, Inc., 41 Conn. Sup., 31, 36
(1987); quoting Prosser and Keeton, Torts (5th ed.) p. 774. An action for defamation requires the publication of a false statement by the defendant and harm to the plaintiff's reputation. See Burns v. Telegram Publishing Co., 89 Conn. 549
(1915).
Defamation claims are divided into two categories: libel and slander. Libels are written defamations and slanders are oral defamations. The plaintiffs allege that Carroll's oral statements represent slanders and per se slanders. Slanders per se are statements which by their nature are inherently defamatory. The specific slanders at issue here involve the defendant's alleged defamatory statements directed to the plaintiffs' business, New Dimensions. Under Connecticut law, such slander directed to a person's business is actionable per se only if the statements charge the plaintiff with general incompetence or dishonesty. SeeMoriarty v. Lippe, 162 Conn. 371 (1972). When a plaintiff has been subjected to per se slanders, the law presumes that the plaintiff suffered injuries, and therefore, the plaintiff may recover general damages without pleading or proving them. Id. On the other hand, when the slander is not actionable per se, a plaintiff may recover only the specific damages which are pleaded and proven. Whether a statement is slanderous per se presents a question of law. CT Page 3363
None of the statements made by Carroll charged the plaintiffs with incompetence or lack of integrity sufficient to make the statements slanderous per se. Carroll's statements that the business was under a threat of closing because of financial problems and foreclosure proceedings asserted specific acts which did not indicate that the Nemeths were running the business incompetently or dishonestly. Allegations that a business is having financial problems, even when the allegations are false, do not on their face imply that the business is being poorly or improperly run, because the best managed business can encounter financial difficulties and fail. Furthermore, slander per se cannot be established by innuendo or implication. See generally,Herman v. Post, 98 Conn. 792 (1923) (the defendant's statement that a merchant was a crook because he owed money forcing his business to be relocated was not slanderous per se); Yakavicze v.Valentukevicious, 84 Conn. 350 (1911) (the court will not find through innuendo that allegations that a person is a cheat and a thief were per se slanders charging the person with a crime).
Therefore, judgment shall enter in favor of the defendant and against the plaintiffs on the counts of the Amended Complaint based on slander per se.
II. Slander
The remaining defamation counts of the Amended Complaint are based on ordinary slander. The court finds that the statements made by Carroll that New Dimensions had been involved in repeated foreclosure proceedings and that the business was threatened with closing because of financial problems were untrue. These statements would tend to besmirch the commercial standing or reputation of the business, and if the statements were believed or acted upon, they might tend to deter people from associating or dealing with the business. Therefore by pleading and proving special damages, New Dimensions could establish an action for slander against Carroll entitling it to monetary relief.[2]
New Dimensions claims that it has suffered diminished market value and lost profits as a result of Carroll's statements. The plaintiffs do not claim that New Dimensions' total membership or revenues have decreased since the club started in 1989. The evidence establishes that the business' income and membership have generally increased over the years since its opening. For example, 1991 is the year when the rumors allegedly circulated CT Page 3364 the most and when the sales appeared to be most visibly affected; and in 1991, as compared to 1990, the total number of membership sales (which includes one year renewals and membership conversions from three months to one year) actually increased from 1,341 to 1,466. There was a larger increase of total sales between 1991 (1,466) and 1992 (1657). (Exhibits 51, 52, 53, and 54; see also Exhibit 73g). Similarly, since 1991, New Dimensions' total revenues before sales taxes increased every year from $475,577 in 1991, to $587,244 in 1992, to $641,131 in 1993. (Exhibit 50)
Thus, the thrust of the plaintiffs' claims is that the growth of New Dimensions' business has not been as consistent or as large as it should have been. For example, between 1990 and 1991, the total revenues before taxes slightly decreased from $483,011 to $475,577. (Exhibit 50). Additionally, the plaintiffs emphasize, among other things, that new joiners decreased between 1990 (1,126) and 1991 (1,082); (Exhibits 51,53); and there were also fewer short term memberships between 1990 (387) and 1991 (376). (Exhibit 53). See Plaintiff's Trial Brief, pp. 31-32.
The plaintiffs support their damage claim primarily on the testimony of their expert witness, Richard Caro. Mr. Caro has an extensive background in the management of fitness centers and the economics of running such centers. Caro reviewed New Dimensions' business organization and market pool. He testified that New Dimensions' market, physical plant, staff, finances, advertising, management and services were either fully adequate or superior in quality. He compared New Dimensions against models and assumptions based on data from other clubs around the country and from the health club industry in general to conclude that New Dimensions was not as profitable between 1990 and 1994 as it should have been, and that New Dimensions had experienced a decreased market value. Caro testified that he ruled out the effects of the recession, the Spa Lady closing and New Dimensions' management as being factors causing these losses, and he concluded that the losses could only be explained by the negative consequences of the false rumors. In his opinion, New Dimensions suffered a market value loss of $604,000.00 and a cash flow loss of $426,693.00, making New Dimensions' total losses allegedly caused by Carroll to be $1,030,693.00.
In response to Mr. Caro's testimony, the defendant argues that the plaintiffs have failed to remove their damage claim from the realm of speculation and have failed to establish that any CT Page 3365 revenue deficiencies or failed projections were caused by Carroll's statements. (Defendant's Trial Brief, pp. 21-28). The court agrees with the defendant's position. The court finds that Mr. Caro's testimony lacks credibility and that New Dimensions has failed to prove by a preponderance of the evidence that Carroll caused the alleged damages.
The plaintiffs did not offer any direct evidence to support their claims for damages. As indicated earlier, the plaintiffs did not offer any witness who testified that she terminated her membership because she spoke to Carroll or because she heard any negative rumors. Three witnesses testified that Carroll actually made derogatory comments to them; only one of these witnesses was a member, Tate O'Leary, and she did not testify that she terminated her membership or failed to renew it because of rumors. Thus, there was no direct evidence establishing the actual extensiveness of any comments made by Carroll or any direct evidence connecting any comments made by him to any specific business loss. Moreover, although New Dimensions was not having serious financial difficulties in 1990, its owner, Mr. Nemeth, was having financial trouble. The rent assignment and foreclosure action instituted by People's Bank were not private matters, and it would not have been unreasonable for people to acquire information about these events and attribute the problems not only to Mr. Nemeth, but also to his businesses.
Furthermore, the court credits the testimony of the defendant's expert witness Anthony Hernandez, a certified public accountant, who testified that numerous factors, especially Connecticut's recession in the early 1990's, would have had a significant, cumulative effect on New Dimensions' business. Specifically in response to Hernandez's testimony regarding the effects of the recession, the plaintiffs rely on Mr. Caro's testimony, based on published, industry wide data, that the health care industry generally prospered during the recession. Mr. Caro's opinion is that health clubs thrive during economic downturns because people will seek out health clubs rather than more expensive recreational alternatives. The court rejects Mr. Caro's testimony as being conjectural and insufficiently supported. As Mr. Hernandez testified, service industries, including the fitness club industry, are rarely immune from recessionary trends. Mr. Caro testified about industry wide financial trends that occurred during the recession, but he did not provide any specific data for Connecticut or even for the New England area generally; nor did he adequately explain or CT Page 3366 establish that the industry data relied on was applicable to the recessionary period suffered in the New England area. Moreover, the owner of the previous health club at this location, the Spa Lady, was unable to sell the Fairfield club and closed it. Furthermore, two other clubs in the area also closed during this time period.
Additionally, Mr. Caro's opinion heavily relied on performance comparisons between New Dimensions and other clubs, but because of self-imposed confidentiality restrictions, little information was provided to evaluate or determine whether these clubs had characteristics which could be fairly or appropriately compared to New Dimensions' characteristics.
In short, much of the plaintiffs' evidence regarding damages is premised on subjective interpretations and judgments by the testifying expert, rather than on objectively verifiable evidence or criteria. Certainly, causation and damages may be established by expert testimony, and the plaintiffs are not "required to show only one possible theory of causation, negating all others."Slepski v. Williams Ford, Inc., 170 Conn. 18, 22 (1975). Moreover, the plaintiffs are not required to prove the amount of loss with exactitude, and the difficulty in assessing damages is not a sufficient reason to disallow them. See Ball v. PardyConstruction Company, 108 Conn. 549 (1928). Nevertheless, the plaintiffs must establish a foundation to enable the trier to make a fair and reasonable estimate of the damages, and this foundation must rest upon more than surmise or conjecture. Id.; See also, Shelmitz v. Greenberg, 200 Conn. 58 (1986). The plaintiffs have failed to establish that their damage claim is based on more than mere speculation and they have failed to establish a foundation to allow the court to make a reasonable estimate of possible losses.
Therefore, judgment shall enter in favor of the defendant and against the plaintiffs on the counts of the Amended Complaint based on slander.
 B Cutpa Claim
CUTPA provides, in relevant part, that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce". CT Page 3367 C.G.S. Sec. 44-110b(a). A prevailing party in a CUTPA action is entitled to recover actual damages, and the court, in its discretion, may also award punitive damages, costs, and attorney fees. C.G.S. Sec. 44-110g. The nature and extent of the parties' relationships and Carroll's statements establish that the plaintiffs have failed to prove that Carroll committed any act that was an "unfair or deceptive" act conducted as part of a "trade or commerce".
Carroll individually does not conduct any "trade or commerce" with any of the plaintiffs. Gun Rack, Ltd. has a lease with Mr. Nemeth, but Gun Rack is not a party to this action.
Carroll made disparaging remarks about New Dimensions' financial viability, but these statements were not made to improve or enhance Gun Rack's business. First, Gun Rack and New Dimensions were not competitors. Second, Carroll's statements about New Dimensions were made because of the bitter and antagonistic personal relationship between Carroll and Mr. Nemeth. The plaintiffs' arguments to the contrary are rejected as being speculative and unproven by the evidence. Plaintiffs claim that Carroll's interest in purchasing Mr. Nemeth's commercial property prompted Carroll to slander New Dimensions in order to improperly advance this interest. The court finds this allegation to be pure speculation, and in any event, Carroll was not in the business of purchasing real estate and his interest in the property was not directly connected to his conduct of any "trade or commerce". See Arawana Mills Co. v. United Technologies Corp. ,795 F. Sup. 1238, 1252-1253 (D.Conn. 1992).
Carroll's wife submitted an affidavit to People's Bank as part of its foreclosure action against Mr. Nemeth. In this affidavit, she alleged that Mr. Nemeth, as landlord, was not providing air conditioning or fixing a leaky roof. However, Mrs. Carroll is not a party to this action. Furthermore these statements made to People's Bank involved hotly contested disputes between the parties, and under the circumstances, they do not constitute deceptive or unfair trade practices. The plaintiffs also claim that Mr. Carroll was motivated to interfere with Mr. Nemeth's relationship with People's Bank because if the bank's foreclosure was successful, Gun Rack would have been able to avoid its responsibilities under the lease. The basis for this contention is entirely unclear and without proven evidentiary support, particularly since People's Bank, as mortgagee, retained and intended to enforce its rights under the lease as evidenced CT Page 3368 by its enforcement of its assignment of rents. In short, Carroll's actions are simply too remote and incidental to any conceivable "trade or commerce" conducted by him in order for plaintiffs to establish a CUTPA violation. See generally, Haynesv. Yale New Haven Hospital, 243 Conn. 17, 32-39 (1997); ArawanaMills Co. v. United Technologies Corp. , 795 F. Supp., supra, at 1252-1253.
Lastly, assuming arguendo, that Carroll's actions constituted unfair or deceptive trade practices under CUTPA, the court finds that no damages are recoverable. As the court has found that the plaintiffs have failed to establish damages that are not speculative in nature and have failed to provide the court with a means to make a reasonable estimate of any losses, the court concludes that the plaintiffs have also failed to establish any "actual" damages sufficient to allow a compensatory recovery under CUTPA. Additionally, the court concludes that under all the circumstances, the nature and the proven consequences of the statements expressly shown to have been made by Carroll do not warrant an award of punitive damages, costs or attorney's fees.
 CONCLUSION
Therefore, for all the foregoing reasons, judgment enters in favor of the defendant.
Dated this 30th day of March, 1998.
STEVENS, J.