**12-2698-cv**
**Dongguk University v. Yale University**

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT


August Term, 2012

(Argued: March 4, 2013    Decided: August 15, 2013)


Docket No. 12-2698-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

DONGGUK UNIVERSITY,

*Plaintiff-Appellant,*

v.

YALE UNIVERSITY,

*Defendant-Appellee*,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Before:

FUENTES,[*] SMITH,[*] and FISHER,[*] *Circuit Judges*.

Appeal from an order of the United States District Court for the District of Connecticut (Melançon, *J.*[**]) granting in part and denying in part Defendant's motion for summary judgment and an order granting Defendant's motion for reconsideration. The district court correctly dismissed all of Plaintiff's claims. We therefore AFFIRM the judgment of the district court.

---

[*] The Honorable Julio M. Fuentes, The Honorable D. Brooks Smith, and The Honorable D. Michael Fisher, of the United States Court of Appeals for the Third Circuit, sitting by designation.

[**] The Honorable Tucker L. Melançon, of the United States District Court for the Western District of Louisiana, sitting by designation.

ANDREW KRATENSTEIN, McDermott Will & Emery LLP, New York, NY (Robert A. Weiner, McDermott Will & Emery LLP, New York, NY, Ira B. Grudberg, Jacobs, Grudberg, Belt, Dow & Katz P.C., New Haven, CT, *on the brief*), *for Plaintiff-Appellant.*

FELIX J. SPRINGER (Howard Fetner, *on the brief*), Day Pitney LLP, Hartford, CT *for Defendant-Appellee.*

FUENTES, *Circuit Judge*:

This appeal concerns a defamation, negligence, and reckless conduct suit by Dongguk University of South Korea against Yale University over a bogus Ph.D. Dongguk University hired Shin Jeong-ah as an art history professor after Yale mistakenly confirmed her doctoral degree. What started out as a straightforward correspondence between universities about a student who sought to teach at one school and claimed she had graduated from the other school, now requires that we determine whether the mistaken answer given by Yale is entitled to heightened constitutional protections under the First Amendment. Dongguk, a prominent Korean university, claims that Yale acted negligently and engaged in reckless and wanton conduct when responding to an inquiry about whether Jeong ah Shin had received a Ph.D. from Yale.

## I. BACKGROUND

**A.      Dongguk's Initial Correspondence with Yale**

In August 2005, Shin Jeong-ah applied for a position as an art history professor at Dongguk University in South Korea. Dongguk, which was founded in 1906 is "one of the most prestigious Buddhist-affiliated universities in the world." App. 34. Dongguk is well regarded throughout Korea for its Buddhist studies curriculum, basic sciences, literature, and cultural programs, and has produced Nobel Prize-winning authors and poets. App. 34-35. The University's "alumni hold important and prestigious positions in Korean business, cultural, and governmental organizations." App. 35.

In her application, Shin stated that she had served as the curator for two Korean museums and was a lecturer at several well respected Korean universities. She also

1

submitted a document to Dongguk on Yale University letterhead purportedly certifying that she had received a Ph.D. from Yale in art history in May 2005 (the "Certification"). The Certification contained an exact reproduction of Yale Associate Dean Pamela Schirmeister's signature but misspelled both Schirmeister's typed name as "Schirmestr" and the word "century" in her listed concentration "Twentieth Centry Art." App. 1909. Nevertheless, Dongguk hired Shin on September 1, 2005. Four days later, Dongguk sent Yale a letter with the Certification attached, seeking to verify its authenticity (the "Inquiry Letter"). The Inquiry Letter reached Schirmeister who responded by fax on September 22, 2005, stating, "I am confirming that the attached letter [the Certification] was issued by the Yale Graduate School and signed by me" (the "Schirmeister Fax"). App. 312.

**B.      Dongguk's Requests for Clarification from Yale**

In early June 2007, nearly two years after hiring Shin, Dongguk learned that Shin may have plagiarized the dissertation that she provided to Dongguk. Consequently, Cho Euiyon, Director of Dongguk's Office of Management and Supervision, emailed an inquiry to a Yale librarian who responded that Yale had no record of Shin's dissertation. Director Cho then emailed an inquiry to the graduate registrar for Yale's art history department mentioning that Shin had identified a Yale professor as her dissertation advisor. The registrar informed Cho that Shin had not received a Ph.D. from Yale and forwarded the correspondence to the purported advisor who in turn responded to Cho that she neither advised Shin nor knew of her.

2

By mid-June, the Korean press began reaching out to Yale regarding Shin's degree. One reporter told the registrar that "[i]f [Shin] is lying mentioning Yale," it would be problematic for Yale's reputation in Korea. App. 2086. The registrar forwarded the reporter's inquiry to others at Yale, noting that she found it "very distressing" and "seem[ed] to have 'litigation' written all over it." App. 2097-98. Thereafter, Yale Deputy General Counsel Susan Carney and Yale Dean Edward Barnaby began referring all Shin-related media inquiries to Yale's Office of Public Affairs. In light of the scandal surrounding her credentials, Shin resigned from Dongguk in late June 2007, and the Korean media began reporting that Shin may have lied about receiving a Yale Ph.D.

In July 2007, Dongguk's President Youngkyo Oh wrote Yale's President Richard Levin to determine if Shin had received a Ph.D. from Yale. President Oh noted the "contradictory" answers Dongguk had received from Yale on that question in the past and attached the Schirmeister Fax that had validated Shin's purported Certification. App. 2239. Deputy General Counsel Carney prepared a response to Oh's letter and sought edits from Dean Barnaby. Carney expressed "concern about the apparent fax lines on the [Schirmeister Fax] transmittal sheets, and the apparent receipt within the Dean's office of the 2005 inquiry" but queried whether "that is false, too." App. 2263. Carney was also forwarded an email from a Korean museum official that had initially been sent to Gila Reinstein, Assistant Director of Yale's Public Affairs Office who was responsible for Shin media inquiries. The email drew attention to the "fax number of [the] Associate Dean's office" on the Schirmeister Fax. App. 2284. Carney commented to the Yale President's assistant that she and "Barnaby . . . were troubled about the fax line" at the

3

top of the Schirmeister Fax but noted that "it's pretty easy to make up fake documents including such lines these days." App. 2282. Nonetheless, she found it "troubling" that she had not previously seen the 2005 Inquiry Letter from Dongguk, and she referenced the email Reinstein had forwarded, pointing out that the Schirmeister Fax contained "indicia of authenticity . . . that seemed to have come from the Yale Graduate School." App. 2282-83. Still, Carney did not ask Schirmeister if she had sent the fax. Instead, she asked Yale Police Department Sergeant Peter Bruno to "look" into the matter and to determine if Shin had an "accomplice" at Yale. The record on appeal does not reflect that the Yale Police Department ultimately conducted any further investigation or interviewed any witnesses on the matter. App. 2655, 2735.

On July 10, 2007, Carney responded to President Oh's letter and stated that Shin was never a student at Yale and that the documents that Dongguk had provided Yale, including Shin's purported Certification and the Schirmeister Fax, were "not authentic." App. 3779. She emphasized that she had no knowledge how the documents were issued or if they were provided to Dongguk and that Yale was "investigating" the matter. App. 2265. Dongguk's Office of Management and Supervision Director Cho repeatedly followed up with Carney on the results of Yale's investigation, and Carney responded that "[i]nvestigators here are examining the documents . . . and will be making further inquiries." App. 1212.

In late August 2007, Director Cho informed Carney that Dongguk had learned that the Inquiry Letter had been delivered on September 20, 2005 to an individual at Yale named Michael Moore, and she provided Carney with a U.S. Postal Service tracking

4

record indicating that the letter was signed for by "M MOORE YCM" in New Haven. App. 1234. Carney responded that neither "YCM" nor a "Michael Moore" was affiliated with the Graduate School office where Schirmeister worked. App. 1234. Cho then responded with a link to the Yale Central Mailroom's website, listing Michael Moore as a staff member. After much correspondence, Cho provided Carney with the mailing label and receipt for Dongguk's Inquiry Letter, but Carney never answered Cho's questions about whether the Inquiry Letter was ultimately delivered to Schirmeister.

**C.    Media Response to Shin Scandal**

By July 2007, following Shin's resignation from Dongguk, the Korean media began reporting extensively on the "Shin scandal." There were numerous media inquiries directed at Yale, and Reinstein from the Office of Public Affairs was responsible for responding. On July 17, Reinstein drafted a statement that said that "[a]ny document purporting to support [Shin's] claim is false and was not issued from Yale," and she sought its approval from Public Affairs Director Helaine Klasky. App. 2309. Klasky asked if there was "language cleared by the GC's office" for Reinstein to use. *Id.* Between July 10 and 12, Carney had sent and received 16 privileged emails related to Dongguk, including two that copied Reinstein. After Reinstein responded to the media inquiries, she was quoted in articles published on July 19 and July 21 as saying that the Schirmeister Fax was a "fake," "falsified," and that Yale had "never received" the original Inquiry Letter. App. 2328, 2332. Dongguk responded to Reinstein's statements by releasing its internal investigation report, which concluded that Dongguk had sent the

5

Inquiry Letter to Yale and received the Schirmeister Fax, which validated Shin's doctorate degree, in response.

After receiving additional media inquiries about the Schirmeister Fax, on July 20, Schirmeister reached out to Reinstein about a media inquiry Schirmeister had received and Schirmeister reached out to Carney on whether to reply. Following an exchange of 13 privileged emails between Carney and Reinstein, Reinstein told a reporter:

> [I]t is clear that Jeong Ah Shin was never a student at Yale. Yale has no record of her.
>
> *Neither Pam Schirmeister nor any other Yale official signed documents affirming that she earned a degree.* The phone and fax numbers on the *false documents* are correct, but that information is public knowledge. *If Yale had received a request* to confirm that Shin earned a degree from the Graduate School, Yale would have responded that she did not.
>
> *The documents Shin supplied are clearly false* . . . . The fax that *supposedly* came from Associate Dean Pamela Schirmeister bears no resemblance to the letter her office sends to confirm a degree. In addition, the fax misspells "Schirmeister," among other errors.

App. 1263 (emphasis added).

In early August 2007, a South Korean television program reported at length about the Shin scandal, in which a reporter criticized Dongguk for "so loosely" conducting Shin's "verification." App. 485. The narrator described Dongguk's receipt of the Schirmeister Fax as "all the action Dongguk University [had taken] to verify [Shin's] academic degree" and said the fax "was a fake." App. 486-87. Reinstein appeared in the program and responding to queries about the Schirmeister Fax claimed "Yale would not send out a document like that. . . . [T]his is a false document. I don't know how it came into existence. But it's not from Yale." App. 487. The narrator said that "Yale disclosed

6

that it had never received a letter requesting verification from Dongguk University in September 2005" and did not "sen[d] a reply by fax to Dongguk University." *Id.* Throughout September 2007, Reinstein continued responding to reporters' questions, repeatedly denying the Schirmeister Fax's authenticity and stating that it "bears no resemblance to the letter that Dean Pamela Schirmeister sends when she is actually confirming someone's degree." App. 464.

Ultimately, the Shin scandal was exacerbated by media reports that Shin had had an affair with Byeon Yang-kyoon, a senior South Korean government official. The scandal included reports that Byeon had pressured a Dongguk board member to cover up Shin's fraud and had arranged for government funding of the private temple of Dongguk's board chairman. While initial stories focused on whether Dongguk had done enough to verify Shin's degree, by the fall of 2007, the Korean media's focus shifted to Byeon and whether he had pressured Dongguk to hire Shin and thereafter to cover up her false degrees. In late 2007, articles emerged that reported Dongguk's significant increase in government grants after it hired Shin. Dongguk alumni and former professors began calling on Dongguk's president and chairman to resign, contending that their handling of "the Ms. Shin incident" "denigrate[d] the members of the community" and that the "current chaos, triggered by the so-called Shin Jeong-Ah scandal, has no end in sight." App. 1190, 2533.

**D. South Korean Criminal Investigation and Yale Response**

Meanwhile, during the summer of 2007, Dongguk filed a criminal complaint against Shin for business interference with the Korean prosecutor's office. But by

7

September, the prosecutor's investigation shifted toward Dongguk, and they conducted a three-day search of the Dongguk campus, including the offices of President Oh and the Chairman of the Board of Trustees, and seized documents related to government grant programs and investigations on faculty employment. The investigation resulted in evidence of corruption involving Byeon and led to Shin's arrest in early October 2007.

Throughout this time, Yale monitored media stories on the Korean prosecution, and Yale's Public Affairs Director Klasky observed that Yale's name was "getting dragged through the mud" and asked if Yale should "issue[] another statement and sen[d] it to all the Korean papers." App. 2495. Accordingly, Public Affairs Assistant Director Reinstein drafted a statement in late September 2007 that she sent to the media and published on Yale's website, reasserting that Shin never enrolled at Yale and that any document stating otherwise "is false and was not issued by Yale University." App. 2506. The Korean media reported Yale's statement with the headline: "Rare Statement by Yale University, 'All Shin Documents Forgeries.'" App. 2509.

On October 17, 2007, the U.S. Attorney's Office for the District of Connecticut, at the request of Korean prosecutors, subpoenaed Yale for answers on the following questions: (1) whether Shin was ever enrolled at Yale's Graduate School; (2) whether the Certification of Shin's degree was issued by Yale; (3) whether Yale received Dongguk's Inquiry Letter in September 2005; (4) whom the Inquiry Letter was delivered to; (5) whether and when the Inquiry Letter was answered; and (6) what answer was given. The next day, Harold Rose, Yale's Associate General Counsel, began investigating whether Yale had in fact received the Inquiry Letter. Using the postal tracking information for the

8

Inquiry Letter that Deputy General Counsel Carney had received previously and was enclosed with the subpoena, the Yale mailroom quickly confirmed its receipt of the letter and subsequent delivery to the Graduate School in September 2005. Schirmeister then asked her assistant to look for the Inquiry Letter. On October 18, the assistant found Dongguk's Inquiry Letter in a file with other 2005 correspondence, along with the Schirmeister Fax that was sent in response. Schirmeister provided these documents to Rose, who in turn responded to the DOJ subpoena, stating that Yale had received the Inquiry Letter in September 2005, that Schirmeister had responded by fax and confirmed that the Certification was issued by Yale and signed by her, but that "Schirmeister now believe[d] that this answer was an error." App. 523. It is unclear if or when DOJ provided the response to the Korean prosecutor's office or if that information was ever provided to Dongguk.

On November 29, 2007, over one month after Yale's discovery of its receipt of the Inquiry Letter and of its response by fax, Carney wrote President Oh to correct her misstatement regarding the authenticity of the Schirmeister Fax in the July 2007 letter. She stated that the Schirmeister Fax "was indeed authentic" despite her earlier "inadvertent[]" statement that it was "not authentic and did not follow Graduate School format." App. 422. Carney reinforced, though, that Shin had not received a Yale degree and that Shin's purported Certificate was inauthentic. On December 27, Dongguk informed the Korean media that Yale had confirmed that the Schirmeister Fax was genuine. As a result, a reporter who had previously spoken with Reinstein reached out to her, noting her "surprise[]" given Reinstein's previous statements to the contrary. App.

9

2548. The reporter told Reinstein that the focus of his story had shifted to why Schirmeister sent the fax, which Reinstein had previously said was of a "totally different format from what Yale" would send. App. 2545. After Reinstein forwarded the email to Carney, Yale released a statement that, "[r]espond[ing] quickly to what appeared to be a routine request, Yale's staff mistakenly relied on the letterhead and signature on the [Certification] and failed to recognize it as fabricated." App. 643. The statement emphasized that Yale's initial review "suggested" that the Schirmeister Fax had not been sent by the Graduate School but that "a more thorough investigation and document search concluded that Yale indeed erroneously verified the [Certification] as a result of an administrative error." *Id.*

Dongguk contends that as a result of the Shin scandal, the University suffered a substantial financial loss. Dongguk's applications for government grant funding were rejected, which Dongguk asserts was "due to Yale's false statements, the widely covered reports of Dongguk's wrongdoing, and the Korean prosecutors' investigation of Dongguk and the Ministry of Education." App. 1592. Additionally, numerous individuals who had pledged donations to Dongguk as part of President Oh's substantial fundraising campaign revoked their pledges. Finally, Dongguk contends that it was "publicly humiliated and deeply shamed in the eyes of the Korean population" as a result of the Shin scandal and that its reputational injury affected its dignity and credibility as a university. App. 55. The Wall Street Journal reports that Shin ultimately served 18 months in prison for embezzlement and falsifying academic records. Jaeyon Woo, *Disgraced Curator Returns*

10

*With Her Memoirs*, Wall St. J., Mar. 23, 2011, http://blogs.wsj.com/korearealtime/ 2011/03/23/disgraced-curator-returns-with-her-memoirs.

## II. PROCEDURAL HISTORY

In March 2008, Dongguk filed a complaint against Yale in the United States District Court for the District of Connecticut, alleging defamation, negligence, and reckless and wanton conduct claims under Connecticut state law. The defamation claim was based on statements by Yale to the Korean media that it never received the Inquiry Letter and never sent the Schirmeister Fax. The negligence claim was based on Schirmeister's incorrect statement in the Schirmeister Fax, Carney's incorrect statement in her July 2007 letter to Oh that the Schirmeister Fax was inauthentic, and Yale's statement on its website that the Schirmeister Fax was not issued by Yale. The reckless and wanton conduct claim was based on Schirmeister's failure to accurately verify Shin's degree, Carney's failure to determine the authenticity of the Schirmeister Fax, and Yale's statements to third parties that it never received the Inquiry Letter or sent the Schirmeister Fax.

In February 2012, the District Court granted summary judgment for Yale on the reckless and wanton conduct claim but allowed the defamation and negligence claims to go forward, while limiting the defamation claim to certain damages and the negligence claim to statements made directly to Dongguk. *Dongguk Univ. v. Yale Univ.*, No. 08-cv-0441 (TLM), 2012 WL 441250 (D. Conn. Feb. 10, 2012). Yale moved for reconsideration, and in June 2012, the District Court granted the motion and entered

11

judgment for Yale on all counts. *Dongguk Univ. v. Yale Univ.*, 873 F. Supp. 2d 460 (D. Conn. 2012). Dongguk appealed.

## III.    ANALYSIS[1]

**A.    Defamation Claim**

Dongguk's defamation claim is premised on Yale's communications with the Korean media during three different time frames: (1) its statements in July 2007, (2) its statements in August and September 2007, and (3) its failure to expeditiously correct its misstatements after it discovered its error in October 2007. For the first and second time frames, Dongguk's appeal is limited to Carney's conduct in approving and crafting Reinstein's statements. For the third time frame, Dongguk's claim involves numerous Yale employees' actions, including Carney's, Reinstein's, and Klasky's. Dongguk concedes that the defamatory statements addressed public figures and matters of public concern. App. 34 ("Dongguk University is one of the most important academic institutions in Korea."); *see also* Oral Arg. 14:55, Mar. 4, 2013 (Dongguk's counsel conceding that as of 2007, Carney could "certainly say it's foreseeable that we know this is a matter of national importance in Korea").

Under Connecticut law, each statement is a separate cause of action and requires proof of each of the elements for defamation. *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d

---

[1] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of summary judgment. *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 224 (2d Cir. 2006). Summary judgment is appropriate when, construing all evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, there exists no genuine issue of material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

12

759, 763-64 (Conn. 2004). To make out a defamation claim, Dongguk must prove that Yale was responsible for the (1) publication of a defamatory statement; (2) identifying Dongguk; (3) to a third person; and (4) that Dongguk suffered injury as a result of the statement. *See id.* Additionally, when a defamatory statement is allegedly made about a public figure, the plaintiff has a heightened burden and must prove that the statement was published with "actual malice." *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967); *see also Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 66 (1976) (recognizing that under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), "the First Amendment places limitations on the States' power to enforce their libel laws).

1.      Actual Malice Standard

We evaluate whether a party is a public figure based on "clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974). If we determine that the party is such a public figure, then the plaintiff has the added burden of proving that the allegedly defamatory statement was published with "actual malice," that is with knowledge that the statement was "false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280. This includes when a defendant acts "with a high degree of awareness of [the statement's] probable falsity or [if the defendant] entertained serious doubts as to the truth of his publication." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (internal quotation marks and citations omitted). Actual malice can be established using circumstantial evidence. *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000).

13

Under Connecticut law, actual malice must be proven by clear and convincing evidence. *Dacey v. Conn. Bar Ass'n*, 368 A.2d 125, 134 (Conn. 1976). The Supreme Court requires proof of actual malice by "convincing clarity," *New York Times Co.*, 376 U.S. at 285, which the Connecticut Supreme Court has interpreted as requiring that the "the probability that [the facts asserted] are true or exist is substantially greater than the probability that they are false or do not exist." *Dacey*, 368 A.2d at 134. Clear and convincing proof "is highly probable" and "leaves no substantial doubt." *Holbrook v. Casazza*, 528 A.2d 774, 784 (1987) (citing *Gertz*, 418 U.S. at 342).

When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice. *See New York Times*, 376 U.S. at 287 ("[T]he state of mind required for actual malice would have to be brought home to the persons in the [defendant's] organization having responsibility for the publication of the [statement]."); *see also Holbrook v. Harman Auto., Inc.*, 58 F.3d 222, 225 (6th Cir. 1995) ("[W]here, as here, the defendant is an institution rather than an individual, the question is whether the individual responsible for the statement's publication acted with the requisite culpable state of mind.").[2]

---

[2] While the District Court initially applied a preponderance of the evidence standard to the question of responsibility for publication, in its reconsideration opinion, it held that the individual's responsibility for publication of the alleged defamatory statement was subject to the clear and convincing evidence standard. *Dongguk,* 873 F. Supp. 2d at 466. While the Supreme Court in *New York Times* held that actual malice must be proven by convincing clarity and that the individual responsible for the

## 2. Failure to Investigate as Actual Malice

Generally, "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." *Gertz*, 418 U.S. at 332 (holding no actual malice by defendant's failure to investigate). In *New York Times*, the Supreme Court held that a defendant's reliance on a responsible source negates a finding of "the recklessness that is required for a finding of actual malice." 376 U.S. at 287-88. Similarly, this Court has held that where reporters' false statements in an article were based on reliable sources, the defendants could "hardly be accused of gross negligence, much less actual malice." *Miller v. News Syndicate Co.*, 445 F.2d 356, 358 (2d Cir. 1971).

But "evidence of an intent to avoid the truth . . . [can be] sufficient to satisfy the [actual malice standard]." *Harte-Hanks*, 491 U.S. at 693. While "a publisher who does not already have 'obvious reasons to doubt' the accuracy of a story is not required to initiate an investigation that might plant such doubt[,] [o]nce doubt exists, . . . the publisher must act reasonably in dispelling it." *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992). Thus, when there is evidence that the defendant acted with a "high degree of awareness of [a statement's] probable falsity," *Garrison v.*

publication must have acted with actual malice, 376 U.S. at 285, 287, it did not specify whether the individual's responsibility for publication must also be proven by convincing clarity. Only the Eighth Circuit has considered this question, and it applied the convincing clarity standard to the issue of whether the relevant individual had responsibility for publication of the defamatory statement. *Speer v. Ottaway Newspapers, Inc.*, 828 F.2d 475, 476 (8th Cir. 1987). We need not decide whether the appropriate standard of proof of an individual's responsibility for publication is preponderance of the evidence or clear and convincing evidence because we will hold that Dongguk has failed to establish any genuine issue of material fact that Carney acted with actual malice. Thus, we need not evaluate whether Carney was responsible for publication of Reinstein's statements.

15

*Louisiana*, 379 U.S. 64, 74 (1964), or that the defendant "entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or that the defendant acted with "the purposeful avoidance of the truth," *Harte-Hanks*, 491 U.S. at 692, then the defendant's failure to investigate can demonstrate actual malice.

3.      Application of Actual Malice Standard to Yale's Statements and Conduct

In the instant action, Dongguk alleges that Yale made defamatory statements in July 2007 and during August and September 2007 and that it failed to correct its defamatory statements after October 2007. As stated, the parties concede that the actual malice standard applies to these statements. In applying this standard, we will only consider whether the individual at Yale who was responsible for publication of the defamatory statement acted with the state of mind required for actual malice. For the affirmative statements, Dongguk limits its argument to Carney's state of mind and concedes that if it fails to prove that Carney was responsible for the publication, then it cannot succeed on its defamation claim based on these statements. Oral Arg. 44:15, Mar. 4, 2013.

The allegedly defamatory statements at issue during July 2007 include the following: (1) Public Affairs Assistant Director Reinstein's statements between July 10 and 12 to the Korean press denying the authenticity of the Schirmeister Fax; (2) Reinstein's statement around July 17 that any document purporting to support Shin's Yale degree was not issued by Yale; and (3) Reinstein's quotes in articles published on July 19 and 20 that Yale never received the Inquiry Letter, that she looked for the Inquiry Letter but did not find it, and that Schirmeister never signed a document affirming Shin's

16

degree. The August and September 2007 statements are the following: (1) Reinstein's statements during a television interview airing on August 4 that Yale never received the Inquiry Letter from Dongguk; (2) Reinstein's statement on September 4 that the Schirmeister Fax did not look like something Schirmeister would send; and (3) Reinstein's statement on September 21 that any document supporting Shin's claim to a Yale degree was false and not issued by Yale.

a. *No Showing of Actual Malice by Carney*

Assuming without deciding that Deputy General Counsel Carney was responsible for the publication of Reinstein's statements,[3] Dongguk has failed to demonstrate that Carney acted with actual malice. Dongguk argues that because Carney failed to investigate the truthfulness of Reinstein's statements despite her serious doubts, Carney acted with actual malice. Dongguk points to two statements by Carney, which it argues indicate Carney's suspicions regarding the authenticity of the Schirmeister Fax and Yale's receipt of the Inquiry Letter. First is Carney's July 10 email to Barnaby mentioning her "concern about the apparent fax lines" on the Schirmeister Fax and "the

---

[3] To establish Carney's responsibility for publication of Reinstein's statements, Dongguk points to two sets of privileged communications between Carney and Reinstein, which occurred prior to Reinstein's statements to the media, along with Public Affairs Director Klasky's question whether Reinstein could use language cleared by the General Counsel's office. Dongguk also points to other evidence to demonstrate Carney's responsibility for publication, including Dean Barnaby's email that the Shin matter had been referred to the General Counsel's office and Carney's subsequent response that she would provide information to the media contact, Carney's direct responses to Dongguk's correspondence, and Carney's emails that mentioned her concerns about the phone number on the Schirmeister Fax. Because Dongguk has failed to provide any clear and convincing proof of actual malice, we need not decide whether Carney was responsible for publication of Reinstein's statements.

17

apparent receipt within the Dean's office" of the Inquiry Letter, and Carney's comment that "maybe that is false, too." App. 2263. The second is Carney's email the next day that "Barnaby and I were troubled about the fax line . . . although it's pretty easy to make up the fake documents including such lines these days." App. 2282. Dongguk also points to the correspondence on August 31 between Carney and the Yale police investigator looking into the Shin matter to ask whether the investigator knew what "YCM" was. App. 2409.

Throughout, Carney noted her skepticism about whether the fax line was manufactured. Despite Dongguk's argument that Carney never investigated the authenticity of the Schirmeister Fax, "mere proof of failure to investigate, without more" does not establish actual malice. *Gertz*, 418 U.S. at 332. Here, there is nothing "more." The failure to discover a misstatement may demonstrate negligence but it does not establish actual malice. Even the failure to review one's own files is inadequate to demonstrate malice by the party responsible for publishing a statement. *New York Times*, 376 U.S. at 287-88. There is no evidence that Carney "entertained serious doubts as to the truth" of Reinstein's statements, *St. Amant*, 390 U.S. at 731, or that her decision not to further investigate constitutes "the purposeful avoidance of the truth," *Harte-Hanks*, 491 U.S. at 692. Thus, Dongguk has failed to provide sufficient clear and convincing proof of actual malice on the part of Carney to withstand summary judgment.

                b.       *The Significance of Yale's Failure to Correct Earlier Statements*

Dongguk also contends that Yale's failure to expeditiously retract its earlier misstatement can be relevant to establishing Yale's actual malice at the time the earlier

18

statements were made. Thus, Dongguk asserts that Yale's failure to immediately correct its earlier misstatements after Schirmeister's discovery that she received and responded to the Inquiry Letter can constitute proof of actual malice. Though Schirmeister, Carney, and Reinstein discovered in October 2007 that Reinstein's earlier statements to the press had been incorrect, Yale did not inform Dongguk of its error until November 29 and did not release a public statement confirming its receipt of the Inquiry Letter and sending of the Schirmeister Fax until December 29.

The actual malice inquiry generally considers the state of mind of the defendant at the time the statement was made. *Woodcock v. Journal Publ'g Co.*, 646 A.2d 92, 97 (Conn. 1994). Connecticut courts have held that the failure to correct an earlier misstatement may be relevant to the actual malice inquiry, but this holding has only been applied in circumstances where there was *some* evidence of actual malice at the time the statements were made. *See, e.g.*, *Holbrook v. Casazza*, 528 A.2d 774, 780 (Conn. 1987) (finding that the refusal to retract a false statement "might be relevant" to the defendant's mental state when there was substantial evidence of "animus" and the defendant's "disregard of the probable falsity" at the time of the statement); *Torosyan v. Boehringer Ingelheim Pharm., Inc.*, 662 A.2d 89, 104 (Conn. 1995) (finding a refusal to retract a statement was relevant to the actual malice inquiry when the defendant was notified it was false when coupled with the finding that the defendant made the statement with improper motives).

Here, however, there was no evidence that Carney, Schirmeister, or Reinstein was aware of the probable falsity of the statements at the time they were made or acted with

19

improper motives. Furthermore, Dongguk never requested a retraction from Yale after Yale had discovered its error. Thus, Dongguk's evidence of Yale's failure to expeditiously correct its earlier misstatements fails to provide any further support that any officials at Yale acted with actual malice at the time Reinstein's statements were made. Accordingly, we conclude that Dongguk has failed to raise a genuine issue of material fact with regard to actual malice.

* * *

Viewing the evidence in the light most favorable to Dongguk, we hold that Dongguk has failed to present any evidence that any individual at Yale who was responsible for publication of a defamatory statement acted with actual malice. For these reasons, we will affirm the District Court's grant of summary judgment in Yale's favor on the defamation claim.

**B.    Negligence Claim**

For Dongguk to establish a negligence claim against Yale under Connecticut law, it must establish "duty; breach of that duty; causation; and actual injury." *Sturm v. Harb Dev., LLC*, 2 A.3d 859, 870 (Conn. 2010). On appeal, Dongguk challenges three sets of conduct and direct communications by Yale as negligent: (1) Yale's erroneous validation of the Certification in the Schirmeister Fax in September 2005; (2) Yale's erroneous statements in July 2007 that the Schirmeister Fax was inauthentic; and (3) Yale's delay in correcting its misstatements after discovering its error in October 2007. The District Court dismissed the negligence claims, holding that under *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), a public figure cannot circumvent defamation's heightened

actual malice standard by calling the claim by another tort's name. *Dongguk*, 873 F. Supp. 2d at 469. Under the District Court's extension of *Hustler Magazine*, if a plaintiff seeks damages for reputational injury from speech, then the plaintiff must prove the defendant acted with actual malice. *Id.*

### 1. Extension of Actual Malice Standard outside of Defamation Context

In *Hustler Magazine*, the Supreme Court extended the *New York Times* actual malice standard for defamation claims about public officials to tort claims for intentional infliction of emotional distress for recovery of damage to reputation caused by speech. 485 U.S. at 56. There, the defendant had published a parody about the plaintiff, Jerry Falwell,[4] and the plaintiff had sued for libel, invasion of privacy, and intentional infliction of emotional distress. *Id.* at 48-49. After a jury awarded damages on the intentional infliction of emotional distress claim, the Supreme Court reversed the judgment, noting that while bad motives generally control for the purpose of tort liability, "the First Amendment prohibits such a result in the area of public debate about public figures." *Id.* at 53.

The Court recently faced this issue again in *Snyder v. Phelps*, 131 S. Ct. 1207 (2011). In *Snyder*, the father of a deceased soldier sued a church that had picketed outside of his son's funeral to protest government policy on homosexuality in the military. *Id.* at 1213-14. After the jury awarded the father damages on an intentional infliction of

---

[4] Jerry Falwell is described as "a nationally known minister who has been active as a commentator on politics and public affairs," and the parody portrayed him as having engaged in a "drunken incestuous rendezvous with his mother in an outhouse." *Hustler Magazine*, 485 U.S. at 48.

emotional distress claim and a privacy claim, the Fourth Circuit reversed, concluding that the speech at issue in both claims was protected under the First Amendment. *Id.* at 1214. The Supreme Court, relying on *Hustler Magazine*, held that absent actual malice, the intentional infliction of emotional distress claim was not actionable because the subject matter of the speech addressed matters of public concern. *Id.* at 1219. The Court reasoned that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, [and] is entitled to special protection." *Id.* at 1215. On the other hand, "where matters of purely private significance are at issue, First Amendment protections are often less rigorous . . . because restricting [such] speech does not implicate the same constitutional concerns as limiting speech on matters of public interest." *Id.* at 1215. While "the boundaries of the public concern test are not well defined," the Supreme Court noted that "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is . . . a subject of general interest and of value and concern to the public." *Id.* at 1216 (internal quotation marks and citations omitted). Thus, the Court held that because the speech at issue dealt with "broad issues of interest to society at large," the statements of the protestors met the public concern test and were entitled to "'special protection' under the First Amendment." *Id.* at 1216, 1219.[5]

---

[5] The *Snyder* Court also affirmed the dismissal of the privacy claim, but for a different reason than the Court of Appeals. *Id.* at 1220. While the Fourth Circuit had held that "regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional injury allegedly resulting from the defendant's speech," *Snyder v. Phelps*, 580 F.3d 206, 218, 226 (4th Cir. 2009), the Supreme Court instead held that the plaintiff had not demonstrated a sufficient

2. Whether Negligence Claims are Governed by First Amendment Protections

Here, the District Court applied *Hustler Magazine* and dismissed the negligence claim, reasoning that "a public figure cannot circumvent the strict 'actual malice' standard imposed by the First Amendment by calling his claim for defamation by a different name (tort)." *Dongguk Univ.*, 873 F. Supp. 2d at 469 (internal quotation marks omitted). The District Court relied on the Fourth Circuit's opinion in *Snyder* in holding that heightened First Amendment protections apply to all torts involving speech about public figures. *Id.* After finding that Yale's statements "concerned the relationship and interactions among three figures of public notoriety (Shin, Yale, and Dongguk) and . . . concerned issues related to a national scandal in Korea," the District Court held that the allegedly negligent statements were entitled to heightened constitutional protections. *Id.* at 470.

The *Hustler Magazine*/*Snyder* line of cases demonstrates that the Supreme Court is "particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions." *Hustler Magazine*, 485 U.S. at 51. This is because "the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503-04 (1984). "Under the First Amendment there is no such thing as a false idea." *Gertz*, 418 U.S. at 339. Still, there is such a thing as a false statement of fact, and a "careless error

privacy interest. *Snyder*, 131 S. Ct. at 1219-20. Because the Supreme Court declined to decide whether a tort law privacy claim was subject to heightened First Amendment protections, we write on a clean slate.

23

[does not] materially advance[] society's interest in uninhibited, robust, and wide-open debate on public issues." *Id.* at 340 (internal quotation marks omitted). While "the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate." *Id.* (internal quotation marks omitted). Thus, because "punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press, . . . [t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Id.* at 340-41.

Speech that matters is speech on "matters of public interest." *Snyder*, 131 S. Ct. at 1215. Thus, we hold that when speech is related to a "matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public," *id.* at 1216 (internal quotation marks and citations omitted), then the speaker may be liable for "damage to reputation . . . only if the statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Hustler Magazine*, 485 U.S. at 52 (quoting *New York Times*, 376 U.S. at 279-80). This is true regardless of the claim at issue, be it defamation, intentional infliction of emotional distress, or negligence; heightened First Amendment protections apply to any tort alleging reputational harm as long as the underlying speech relates to a matter of public concern.

The fact that statements may have been communicated privately does not remove them from the ambit of speech entitled to First Amendment protections. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 413 (1979) (noting that "private expression of

24

one's views" is entitled to constitutional protection); *see also Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 46 (2d Cir. 1983) ("[S]peech [that] was made privately, rather than publicly, did not remove it from First Amendment protection."). In *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 160 (2d Cir. 2006), this Court considered whether a private letter sent by a school's athletic director to the superintendent criticizing the football coach's supervision of the team addressed matters of public concern. We held that it indeed addressed "issues that are of paramount interest to a community," and thus "constitute[d] protectable speech, addressing matters of public concerns." *Id.* at 164, 165.

### 3. Application of Negligence Principles and Actual Malice Standard

Dongguk asserts that Yale was negligent in three instances: (1) Schirmeister's September 2005 response to the Inquiry Letter confirming the Certification was signed by her; (2) Carney's July 2007 response to President Oh's letter stating that the Schirmeister Fax was inauthentic; and (3) Yale's failure to promptly correct its earlier misstatement after its October 2007 discovery that it had actually received the Inquiry Letter and had responded with the Schirmeister Fax. Dongguk contends that it suffered reputational harm as a result of Yale's allegedly negligent conduct.[6]

---

[6] Dongguk also asserts that it suffered additional damages resulting from the payment of Shin's salary as a result of the Schirmeister Fax. However, Dongguk failed to raise this injury before the District Court either in its Complaint, damages analysis, or summary judgment briefing, and we decline to consider Dongguk's new argument. Although we may in our discretion consider waived arguments, we will not do so when the "arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (internal quotation marks and alterations omitted).

a. Yale's 2005 Statement—Schirmeister's Fax to Dongguk

We must first resolve whether the Schirmeister Fax is entitled to heightened First Amendment protections by evaluating whether it addressed a matter of public concern. To determine whether speech addresses a matter of public concern, we consider its "content, form, and context as revealed by the whole record." *Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985) (alteration omitted). At the time the Schirmeister Fax was communicated, Shin was not yet a source of controversy in Korea. Dongguk and Yale, however, were both public figures, given both parties' "general fame . . . and pervasive involvement in the affairs of society." *See Gertz*, 418 U.S. at 352. Though Shin's future employer was "one of the most prestigious Buddhist-affiliated universities in the world," App. 34, we are not satisfied that this would make her a "subject of legitimate news interest" in South Korea. *See Snyder*, 131 S. Ct. at 1216. A holding to the contrary would render any communications between two public figures a matter of public concern, even if "there is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press." *Dun & Bradstreet*, 472 U.S at 760 (alteration omitted). Because Schirmeister's response to Dongguk's Inquiry Letter merely confirmed that Shin's fraudulent Certification was signed by her, we conclude that this statement did not address a matter of public concern and heightened First Amendment protections are not warranted.

26

Moreover, Dongguk has failed to demonstrate any genuine issue of material fact that Schirmeister's erroneous statement in her fax responding to Dongguk's Inquiry letter caused the alleged reputational harm to Dongguk. Assuming without deciding that Dongguk presented sufficient evidence to withstand summary judgment on the elements of duty, breach of that duty, and actual injury, *see Sturm*, 2 A.3d at 870, Dongguk must also establish that Yale's conduct legally caused Dongguk's injury. *Winn v. Posades*, 913 A.2d 407, 411 (Conn. 2007). Causation requires Dongguk to satisfy two tests: first, causation in fact, whether "the injury [would] have occurred were it not for the actor's conduct," and second, proximate causation, "whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries," requiring Dongguk to "prove an unbroken sequence of events," tying its injuries to Yale's conduct. *Id.*

Absent evidence from which a trier of fact could reasonably infer that Dongguk's reputational injury was caused by Yale's 2005 statement, summary judgment in Yale's favor is warranted. *C.f. Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 695 (9th Cir. 1998) (finding summary judgment warranted after concluding that no damage resulted from a defendant's negligent *creation* of an advertisement but instead that the alleged damages resulted from the defendant's defamatory act of *publication* of the advertisement, which was addressed by plaintiff's defamation claim). Here, the entirety of Dongguk's argument is that "[h]ad Schirmeister followed Yale's protocols [and] discovered that Shin had not received a Ph.D. from Yale[,] *none of the events that thereafter transpired would have occurred.*" Dongguk's Br. at 56 (emphasis in original); *see also* Dongguk's Reply at 32. The "events that thereafter transpired" ultimately resulted, Dongguk alleges, in

27

reputational harm to Dongguk, specifically that "Dongguk University was publicly humiliated and deeply shamed in the eyes of the Korean population." App. 55. But Schirmeister's erroneous validation of the Certification in 2005 did not cause the alleged public humiliation and deep shame. Rather, Dongguk has failed to present any support for an unbroken sequence of events that ties Dongguk's reputational injury to the Schirmeister Fax. To the contrary, the injury to Dongguk's reputation was caused, if at all, by the news reports of Shin's affair with Byeon, allegations that Dongguk hired Shin in exchange for government grants, concerns about Byeon's involvement in a cover-up of Shin's fraud, as well as Yale's public denials to the media in 2007 that the Schirmeister Fax was fraudulent, among other possible causes. *See Winn*, 913 A.2d at 413 ("The existence of so many possibilities as to the proximate cause of [the injury], together with the lack of facts pointing significantly to any one of them as due to the negligence of the [defendant], renders the question of [the defendant's] negligence too conjectural and uncertain to warrant a verdict against the defendant.") (quoting *Palmieri v. Macero*, 155 A.2d 750, 752 (1959)). Because Dongguk failed to raise any material question of fact that the Schirmeister Fax was the proximate cause of Dongguk's reputational injury, we find no basis from which a reasonable jury could find in Dongguk's favor on the negligence claim. *See Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 120-22 (2d Cir. 2006).

                b.     Yale's 2007 Statement—Carney's Letter to President Oh

Unlike Schirmeister's statement in 2005, Deputy General Counsel Carney's statement to President Oh in July 2007 that the Schirmeister Fax was inauthentic did

28

address a matter of public concern. By the summer of 2007, the Shin scandal had garnered media attention in Korea, Shin had resigned from her position, and the authenticity of the Schirmeister Fax, which provided a basis for Dongguk to hire Shin, was an issue "of paramount interest" in South Korea. *See Cioffi*, 444 F.3d at 164. Because this statement addressed a matter of public concern, it is entitled to heightened First Amendment protections, and Dongguk can only seek damages for its reputational injury after proving that Schirmeister or Carney acted with actual malice in making each statement. Viewing the evidence in the light most favorable to Dongguk, Dongguk has failed to provide any evidence of any individual at Yale's acting with actual malice when making the 2005 or 2007 statements.

c. Yale's Delay in Correcting Its Misstatements to Dongguk

Finally, Dongguk's negligence claim based on Yale's delay in correcting its earlier misstatement to Dongguk also fails. As the District Court properly held, "Dongguk produced insufficient evidence from which a reasonable jury could conclude that Yale's inaction caused Dongguk any reputational harm separate and apart from the reputational harm caused by Reinstein's publications or Yale's communications made directly to Dongguk." *Dongguk*, 873 F. Supp. 2d at 470. Indeed, the record contains not a single news article that may have further damaged Dongguk's reputation that was published between the discovery of Schirmeister's fax on October 18, 2007 and Yale's November 29, 2007 letter to Dongguk correcting its earlier misstatement. Furthermore, Dongguk also delayed informing the media about Yale's correction for nearly a month, reinforcing our conclusion that there was no additional reputational harm caused by Yale's delay.

29

* * *

Because we conclude that Dongguk has failed to demonstrate any genuine issue of material fact as to whether Schirmeister's statement caused Dongguk's reputational injury, Carney acted with actual malice when making a negligent statement, or additional harm occurred as a result of Yale's delay in correcting its misstatements, we will affirm the District Court's dismissal of Dongguk's negligence claim.

**C.      Reckless and Wanton Conduct Claim**

The District Court dismissed Dongguk's reckless and wanton conduct claim for failing to establish, as required by Connecticut law, that Yale's conduct created an unreasonable risk of "bodily harm" to Dongguk. *See Dongguk*, 2012 WL 441250, at *5. Under Connecticut law, "willful, wanton, or reckless conduct . . . [involves] an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Craig v. Driscoll*, 813 A.2d 1003, 1022 (Conn. 2003) (internal quotation marks omitted). Connecticut courts find that an unreasonable risk of "bodily harm" is essential in a reckless and wanton conduct claim. *Brock v. Waldron*, 14 A.2d 713, 715 (Conn. 1940). While Dongguk contends that the Connecticut Supreme Court has defined reckless and wanton conduct as only requiring general danger rather than bodily harm, Dongguk has not pointed to any case with circumstances involving non-physical harm. *See, e.g.*, *Matthiessen v. Vanech*, 836 A.2d 394, 403 (Conn. 2003) (upholding "serious danger to others" jury charge in case involving bodily injuries from car accident). Given the absence of evidence or allegations that Yale's conduct created a risk of bodily harm to an

individual at Dongguk, we will affirm the dismissal of the reckless and wanton conduct claim.

## IV. CONCLUSION

For the foregoing reasons, we affirm the District Court's judgment granting summary judgment in favor of Yale University and dismissing all claims.